[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12928

_____

D.C. Docket No. 1:10-cr-20896-JAL-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

QUARTAVIOUS DAVIS,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 11, 2014)

Before MARTIN, DUBINA, and SENTELLE,* Circuit Judges.


_____
        *Honorable David Bryan Sentelle, United States Circuit Judge for the District of
Columbia, sitting by designation.

SENTELLE, Circuit Judge:

Appellant Quartavius Davis[1] was convicted by a jury on several counts of Hobbs Act robbery, 18 U.S.C. § 1951(b)(1), (3), conspiracy, 18 U.S.C. § 1951(a), and knowing possession of a firearm in furtherance of a crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. The district court entered judgment on the verdict, sentencing Davis to consecutive terms of imprisonment totaling 1,941 months. Davis appeals, assigning several grounds for reversal. His principal argument is that the court admitted location evidence based on stored cell site information obtained by the prosecution without a warrant, in violation of his Fourth Amendment rights. He assigns other grounds of error going to prosecutorial misconduct, evidentiary sufficiency, and sentencing. For the reasons set forth below, we hold that there is no reversible error, although we do find merit in one argument that the sentence was improperly enhanced. We therefore affirm the judgment below in large part, but vacate a sentencing enhancement regarding "brandishing" a firearm.

## BACKGROUND

On February 18, 2011, a grand jury for the Southern District of Florida returned a seventeen-count indictment against Davis and five co-defendants. Davis was named as a defendant in sixteen of the seventeen counts. Generally, the

---

[1] The Presentence Investigation Report notes that "Quartavius" is the correct spelling of appellant's first name, despite the spelling in the caption. PSR at 5.

2

indictment charged violations of the Anti-Racketeering Act, 18 U.S.C. § 1951 (Hobbs Act), and conspiracy to violate the Hobbs Act. More specifically, the indictment charged Davis with conspiracy to engage in Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts 1, 15); Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Counts 2, 4, 6, 8, 10, 13, 16); and with knowingly using, carrying, and possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Counts 3, 5, 7, 9, 11, 14, 17).

As part of the pretrial proceedings, Davis moved to suppress electronic location evidence that the government had obtained "without a warrant," claiming that the obtaining of that evidence violated his Fourth Amendment rights. The district court denied the motion. Davis renewed the motion during trial, and the district court again denied it. These rulings give rise to Davis's principal claim on appeal, which we will discuss further below. The prosecution proceeded to offer evidence of two conspiracies to commit Hobbs Act robbery and that Davis was part of each conspiracy. The prosecution further presented evidence that the conspirators committed such robberies.

During the trial, one member of each conspiracy testified for the United States. Willie Smith ("Smith") testified as to the first conspiracy, encompassing six robberies at commercial establishments including a Little Caesar's restaurant, an Amerika Gas Station, a Walgreens drug store, an Advance Auto Parts store, a

Universal Beauty Salon, and a Wendy's restaurant. Michael Martin ("Martin") testified as to the second conspiracy, encompassing the robbery of a Mayor's Jewelry store. Smith and Martin testified that Davis was involved in each robbery, where they wore masks, carried guns, and took items such as cigarettes and cash.

Additionally, an eyewitness, Edwin Negron, testified regarding Davis's conduct at Universal Beauty Salon and the adjacent Tae Kwon Do studio. He testified that Davis pointed a gun at his head, pushed a 77 year-old woman and Negron's wife to the ground, and took several items from Negron and others. Another eyewitness, Antonio Brooks, testified that he confronted Davis and his accomplices outside the Wendy's restaurant after that robbery and tried to write down the license plate of their getaway car. Brooks testified that Davis fired his gun at him, and that he returned fire towards the car.

Beyond the testimony, the government produced additional evidence. Surveillance videos showed a man matching Davis's description participating in the robberies at Walgreens, Advance Auto Parts, Wendy's, and Mayor's Jewelry. Smith and Martin identified Davis on the videos. DNA shown to be Davis's was recovered from the getaway car used to flee the scene of the Universal Beauty Salon robbery and the Mayor's Jewelry store robbery.

The prosecution also offered records obtained from cell phone service providers evidencing that Davis and his co-defendants had placed and received cell

4

phone calls in close proximity to the locations of each of the charged robberies around the time that the robberies were committed, except for the Mayor's Jewelry store robbery.  Davis preserved his objection to the cell phone location evidence and his claim that the government's obtaining such evidence without a warrant issued upon a showing of probable cause violated his rights under the Fourth Amendment.

The court submitted all counts to the jury.  During jury arguments, the prosecutor made several questionable statements, including some apparently vouching for the credibility of the government's witnesses.  Upon objections by the defense, the court instructed the jury to disregard the statements by the prosecution.  The jury returned a verdict of guilty on all counts.

Subsequently, the district court sentenced Davis on all counts, and conducted a careful sentencing analysis on the record.  Of particular note to the issues in this appeal, in the sentence on Count 3, which charged the use and carrying of a firearm during and in relation to a crime of violence, the court imposed a seven-year statutory mandatory enhancement pursuant to 18 U.S.C. § 924(c)(1)(A)(ii), which provides for such enhancement where "the firearm is brandished . . . ."  On Counts 5, 7, 9, 11, 14, and 17, which also charged the defendant with using and carrying a firearm during and in relation to a crime of violence, the court imposed a "second or subsequent" enhancement required by 18

5

U.S.C. § 924(c)(1)(C)(i), as each of these offenses was subsequent to the similar violation charged in Count 3.  Noting that 18 U.S.C. § 924(c)(1)(D)(ii) requires consecutive sentences, the court imposed a total term of imprisonment of 1,941 months, approximately 162 years.

Davis raises several allegations of error on appeal.  First, he argues that the district court's denial of his motion to suppress the cell site location information and the admission of that evidence violated his constitutional rights under the Fourth Amendment.  Second, he argues that the prosecutor's misconduct during closing argument rendered his trial unfair, entitling him to a new trial.  Third, he raises sentencing arguments, contending that the district court's applications of the mandatory penalty for second or subsequent offenses and for brandishing a firearm on Count 3 were in violation of his Sixth Amendment rights, and that the 162-year sentence of imprisonment constituted a cruel and unusual punishment in violation of his Eighth Amendment rights.  Further, he raises an issue as to the sufficiency of evidence on the aiding and abetting the use of a firearm charge in connection with a crime of violence in Count 17.  Finally, he makes a broad challenge that "the cumulative effect and prejudice arising from multiple trial errors compels reversal."  We consider each of the listed arguments in turn.

6

I. *Fourth Amendment Issue*

Davis's Fourth Amendment argument raises issues of first impression in this circuit, and not definitively decided elsewhere in the country.  The evidence at issue consists of records obtained from cell phone service providers pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2703(c) and (d).  Under that Act, the government can obtain from providers of electronic communication service records of subscriber services when the government has obtained either a warrant, § 2703(c)(A), or, as occurred in this case, a court order under subsection (d), *see* § 2703(c)(B).  The order under subsection (d) does not require the government to show probable cause.

The evidence obtained under the order and presented against Davis in the district court consisted of so-called "cell site location information."  That location information includes a record of calls made by the providers' customer, in this case Davis, and reveals which cell tower carried the call to or from the customer.  The cell tower in use will normally be the cell tower closest to the customer.   The cell site location information will also reflect the direction of the user from the tower. It is therefore possible to extrapolate the location of the cell phone user at the time and date reflected in the call record.  All parties agree that the location of the user will not be determined with pinpoint precision, but the information is sufficiently specific that the prosecutor expressly relied on it in summing up to the jury in

7

arguing the strength of the government's case for Davis's presence at the crime scenes. Indeed, it is not overstatement to say that the prosecutor stressed that evidence and the fact that the information reflected Davis's use of cell phone towers proximate to six of the seven crime scenes at or about the time of the Hobbs Act robberies.

Davis objected to the admission of the location information in the district court and now argues to us that the obtaining of that evidence violated his constitutional rights under the Fourth Amendment. That Amendment, of course, provides that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation . . . ." U.S. CONST. AMEND. IV. It is a "basic principle of Fourth Amendment law" that searches and seizures without a warrant "are presumptively unreasonable." *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). The SCA does provide for governmental entities requiring records from communication service providers by warrant under subsection (c)(A). However, as noted above, the prosecution obtained the evidence against Davis, not by warrant under subsection (c)(A), but by order under subsection (d). As further noted above, that section does not require probable cause, but only a showing "that there are *reasonable grounds to believe* that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d) (emphasis added). Davis contends that the obtaining of the evidence required a

8

warrant upon probable cause.  The government argues that the evidence is not covered by the Fourth Amendment and was properly obtained under a court order.

As we suggested above, the question whether cell site location information is protected by the Fourth Amendment guarantees against warrantless searches has never been determined by this court or the Supreme Court.  Two circuits have considered the question, but not in the context of the use of the evidence in a criminal proceeding.  Also, one of those opinions issued before the Supreme Court's decision in *United States v. Jones*, ___ U.S. ___ , 132 S. Ct. 945 (2012), the most relevant Supreme Court precedent.

The Third Circuit in *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n. Serv. to Disclose Records to Gov't*, 620 F.3d 304, 317–18 (3d Cir. 2010), heard the government's appeal from an order of a magistrate judge declining to direct a service provider to furnish information by order under subsection (d) and requiring instead that the government pursue a warrant upon probable cause under subsection (c)(A).  Briefly put, that circuit did vacate the magistrate judge's denial, but opined that the magistrate judge in appropriate circumstances might "require a warrant showing probable cause . . . ." *Id.* at 319.

The Fifth Circuit, in *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 612 (5th Cir. 2013), reviewed an application in a similar posture.  In

9

the Fifth Circuit case, the district court had denied orders for which the government had applied under subsection (d).  The Fifth Circuit clearly held that compelling production of the records on the statutory "reasonable grounds" basis is not "per se unconstitutional."  *Id.* at 602.  We will not review at this point the reasoning of either of our sibling circuits, given that the context of the cases is different, and one of those circuits opined before issuance of *Jones*, the most instructive Supreme Court decision in the field.

While *Jones* is distinguishable from the case before us, it concerned location information obtained by a technology sufficiently similar to that furnished in the cell site location information to make it clearly relevant to our analysis.  The present case, like *Jones*, brings to the fore the existence of two distinct views of the interests protected by the Fourth Amendment's prohibition of unreasonable searches and seizures.  The older of the two theories is the view that the Fourth Amendment protects the property rights of the people.  This view is sometimes referred to as the "trespass" theory and "our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century."  *Jones*, 132 S. Ct. at 949 (collecting authorities).  However, in the twentieth century, a second view gradually developed:  that is, that the Fourth Amendment guarantee protects the privacy rights of the people without respect to whether the alleged "search" constituted a trespass against property rights.

10

The privacy theory began to emerge at least as early as *Olmstead v. United States*, 277 U.S. 438 (1928). In *Olmstead*, the government had obtained conversations of the defendants by warrantless wiretap. Because the wires that were tapped were outside the premises of the defendants, the majority of the court, relying on the trespass theory, held that the tapping did not constitute a search within the meaning of the Fourth Amendment. Justice Brandeis, in dissent, expressly viewed the provision against unlawful searches as protecting against "invasion of 'the sanctities of a man's home and the *privacies of life*.'" *Id.* at 473 (Brandeis, J., dissenting) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886) (emphasis added)). Despite Justice Brandeis's criticism, the trespass theory continued to hold sway.

In *Goldman v. United States*, 316 U.S. 129 (1942), the petitioners complained against the government's electronically overhearing conversations in petitioners' offices by the warrantless placement of a listening device on an exterior wall. Because the Court, in what might be described as an esoteric discussion of the placement of the device, concluded that the interception of petitioners' conversation was not aided by trespass, there was no Fourth Amendment violation. However, the privacy theory again advanced in dissent. Chief Justice Stone and Justice Frankfurter, in a two-sentence separate opinion, simply stated their agreement with the dissent in *Olmstead*, and lamented the

11

unwillingness of the majority to overrule that case.  Justice Murphy dissented separately, expressly referencing the "right of personal privacy guaranteed by the Fourth Amendment."  *Id.* at 136 (Murphy, J., dissenting).

The minutiae involved in the application of the trespass theory to the world of electronic information stood out sharply in *Silverman v. United States*, 365 U.S. 505 (1961).  In *Silverman*, police officers testified to the contents of conversations upon which they eavesdropped.  The Supreme Court noted the argument of the defendants that the rationale of *Olmstead* should be reexamined, but concluded that such a reexamination was unnecessary given that the conversations were overheard by means of a "spike mike" driven into the wall of the defendant's premises and making contact with a heat duct therein so as to use the entire heating system as a listening device.  Because that penetration constituted a trespass, the Court did not deem it necessary to reconsider its earlier rationale.

Finally, in *Katz v. United States*, 389 U.S. 347 (1967), the majority of the Supreme Court accepted and relied upon the privacy theory to hold interception of a conversation unconstitutional even in the absence of a physical trespass.  In *Katz*—on facts somewhat reminiscent of *Goldman*—the Court considered evidence obtained by FBI agents through a device attached to the exterior of a telephone booth but not penetrating the wall.  As the government argued that there was no Fourth Amendment violation because there was no trespass, the Court squarely

12

considered the dichotomy between the property and privacy protection theories. The Court held that such a warrantless interception did violate privacy interests protected by the Fourth Amendment. Indeed, it did so construing language from *Silverman* as already establishing "that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral statements overheard without any 'technical trespass under . . . local property law.'" *Id.* at 353 (quoting *Silverman*, at 511). Only one justice dissented in *Katz* and it became indisputable in 1967 that the privacy protection theory was indeed viable.

Therefore, it cannot be denied that the Fourth Amendment protection against unreasonable searches and seizures shields the people from the warrantless interception of electronic data or sound waves carrying communications. The next step of analysis, then, is to inquire whether that protection covers not only content, but also the transmission itself when it reveals information about the personal source of the transmission, specifically his location. The Supreme Court in *Jones* dealt with such an electronic seizure by the government and reached a conclusion instructive to us in the present controversy.

The *Jones* case involved not cell site location data, but the somewhat similar location data generated by a Global-Positioning-System (GPS) tracking device attached to the automobile of a suspected drug dealer by law enforcement agents. Although the agents originally attached the device and gathered the

13

information transmitted by it under the authority of a warrant, that warrant authorized installation in the District of Columbia for a period of ten days. The agents installed the device on the eleventh day outside the District of Columbia. The government then tracked the vehicle's movements for twenty-eight days. The prosecution offered the resulting record of the defendant's movements and whereabouts over that period of time in evidence against him in his trial for drug trafficking conspiracy.

The trial court in *Jones* suppressed the location evidence generated by the device on Jones's vehicle while it was parked in his own premises, but admitted the data reflecting its movements on the streets and highways in the belief that Jones would have no reasonable expectation of privacy when the vehicle was on public streets. *See United States v. Jones*, 451 F. Supp. 2d 71, 87–89 (D.D.C. 2006). On conviction, Jones and a codefendant, Maynard, appealed. The Court of Appeals for the District of Columbia Circuit reviewed the Fourth Amendment issue and noted that the prosecution had employed the GPS device to track Jones's "movements continuously for a month." *United States v. Maynard*, 615 F.3d 544, 549 (D.C. Cir. 2010). The court considered the government's argument that each of Jones's movements over the month was exposed to the public, and that therefore, he had no reasonable expectation of privacy in them. The court rejected this argument, noting that "the whole of one's movements over the course of a

14

month . . . reveals far more than the individual movements that it comprises.  The difference is not one of degree but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life, nor the departure from a routine that . . . may reveal even more." *Id.* at 561–62.

By way of example, the court noted that "[r]epeated visits to a church, a gym, a bar, or a bookie tell a story not told by a single visit . . . ." *Id.* at 562.  The court noted further that "the sequence of a person's movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story." *Id.*

The court recalled the "mosaic theory" often relied upon by the government "in cases involving national security information." *Id.*  As the Supreme Court has observed in that context, "what may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *CIA v. Simms*, 471 U.S. 159, 170 (1985) (internal quotation marks and citations omitted).  The circuit reasoned that although each element of Jones's movements throughout the month might have been exposed to the public, the "aggregation of [those] movements over the course of a month," was not so exposed, and his expectation of privacy was reasonable. *Maynard*, 615 F.3d at 563.  The court reversed Jones's conviction.

The United States sought and obtained *certiorari*. The Supreme Court affirmed. Like the Court of Appeals, the High Court concluded that the warrantless gathering of the GPS location information had violated Jones's Fourth Amendment rights.

While the *Jones* case does instruct our analysis of the controversy before us, it does not conclude it. As discussed at length above, Fourth Amendment jurisprudence has dual underpinnings with respect to the rights protected: the trespass theory and the privacy theory. In *Jones*, Justice Scalia delivered the decision of the Court in an opinion that analyzed the facts on the basis of the trespass theory. Because the agents had committed a trespass against the effects of Jones when they placed the GPS device on his car, the opinion of the Court did not need to decide whether Jones's reasonable expectation of privacy had been violated because his rights against trespass certainly had.

As the United States rightly points out, in the controversy before us there was no GPS device, no placement, and no physical trespass. Therefore, although *Jones* clearly removes all doubt as to whether electronically transmitted location information can be protected by the Fourth Amendment, it is not determinative as to whether the information in this case is so protected. The answer to that question is tied up with the emergence of the privacy theory of Fourth Amendment jurisprudence. While *Jones* is not controlling, we reiterate that it is instructive.

16

In *Jones*, Justice Scalia's opinion for the Court speaks on behalf of the author and three other Justices, Chief Justice Roberts, and Justices Kennedy and Thomas. It is, however, a true majority opinion, as Justice Sotomayor, who wrote separately, "join[ed] the majority's opinion." *Jones*, 132 S. Ct. at 957. However, she did so in a separate concurrence that thoroughly discussed the possible applicability of the privacy theory to the electronic data search. We note that she fully joined the majority's opinion, and was certainly part of the majority that held that such a search is violative under the trespass theory.

Four other justices concurred in the result in an opinion authored by Justice Alito, which relied altogether on the privacy theory. Justice Alito wrote, "I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." *Id.* at 958 (Alito, J., concurring in the result). Justice Alito and the justices who joined him ultimately concurred in the result because they did conclude that "the lengthy monitoring that occurred in this case constituted a search under the Fourth Amendment." *Id.* at 964. Justice Sotomayor, in her separate concurrence, opined that it was not necessary to answer difficult questions concerning the applicability of the reasonable-expectation-of-privacy test to the *Jones* facts "because the government's physical intrusion on Jones' jeep supplies a narrower basis for decision." *Id.* at 957 (Sotomayor, J.,

17

concurring).  Conspicuously, she also noted that "in cases involving even short-term monitoring, some unique attributes of GPS surveillance relevant to the *Katz* analysis will require particular attention."  *Id.* at 955.  She noted that electronic "monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."  *Id.* (citing *People v. Weaver*, 909 N.E. 2d 1195, 1199 (NY 2009).

Even the opinion of the Court authored by Justice Scalia expressly did not reject the applicability of the privacy test.  While chiding the concurrence for "mak[ing] *Katz* the exclusive test," the opinion of the Court expressly noted that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to [the] *Katz* [privacy] analysis."  *Id.* at 953.  In light of the confluence of the three opinions in the Supreme Court's decision in *Jones*, we accept the proposition that the privacy theory is not only alive and well, but available to govern electronic information of search and seizure in the absence of trespass.

Having determined that the privacy theory of Fourth Amendment protection governs this controversy, we conclude that the appellant correctly asserts that the government's warrantless gathering of his cell site location information violated his reasonable expectation of privacy.  The government argues that the gathering of

18

cell site location information is factually distinguishable from the GPS data at issue in *Jones*. We agree that it is distinguishable; however, we believe the distinctions operate against the government's case rather than in favor of it.

*Jones*, as we noted, involved the movements of the defendant's automobile on the public streets and highways. Indeed, the district court allowed the defendant's motion to suppress information obtained when the automobile was not in public places. The circuit opinion and the separate opinions in the Supreme Court concluded that a reasonable expectation of privacy had been established by the aggregation of the points of data, not by the obtaining of individual points. Such a mosaic theory is not necessary to establish the invasion of privacy in the case of cell site location data.

One's car, when it is not garaged in a private place, is visible to the public, and it is only the aggregation of many instances of the public seeing it that make it particularly invasive of privacy to secure GPS evidence of its location. As the circuit and some justices reasoned, the car owner can reasonably expect that although his individual movements may be observed, there will not be a "tiny constable" hiding in his vehicle to maintain a log of his movements. 132 S. Ct. at 958 n.3 (Alito, J., concurring). In contrast, even on a person's first visit to a gynecologist, a psychiatrist, a bookie, or a priest, one may assume that the visit is private if it was not conducted in a public way. One's cell phone, unlike an

19

automobile, can accompany its owner anywhere. Thus, the exposure of the cell site location information can convert what would otherwise be a private event into a public one. When one's whereabouts are not public, then one may have a reasonable expectation of privacy in those whereabouts. Therefore, while it may be the case that even in light of the *Jones* opinion, GPS location information on an automobile would be protected only in the case of aggregated data, even one point of cell site location data can be within a reasonable expectation of privacy. In that sense, cell site data is more like communications data than it is like GPS information. That is, it is private in nature rather than being public data that warrants privacy protection only when its collection creates a sufficient mosaic to expose that which would otherwise be private.

The United States further argues that cell site location information is less protected than GPS data because it is less precise. We are not sure why this should be significant. We do not doubt that there may be a difference in precision, but that is not to say that the difference in precision has constitutional significance. While it is perhaps possible that information could be sufficiently vague as to escape the zone of reasonable expectation of privacy, that does not appear to be the case here. The prosecutor at trial stressed how the cell phone use of the defendant established that he was near each of six crime scenes. While committing a crime is certainly not within a legitimate expectation of privacy, if the cell site location data

20

could place him near those scenes, it could place him near any other scene.  There is a reasonable privacy interest in being near the home of a lover, or a dispensary of medication, or a place of worship, or a house of ill repute.  Again, we do not see the factual distinction as taking Davis's location outside his expectation of privacy.  That information obtained by an invasion of privacy may not be entirely precise does not change the calculus as to whether obtaining it was in fact an invasion of privacy.

Finally, the government argues that Davis did not have a reasonable expectation of privacy because he had theretofore surrendered that expectation by exposing his cell site location to his service provider when he placed the call.  The government correctly notes that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities . . . ."  *United States v. Miller*, 425 U.S. 435, 443 (1976).  In *Smith v. Maryland*, 442 U.S. 735 (1979), at the request of law enforcement authorities, a telephone company installed a pen register to record numbers dialed from the defendant's telephone.  The *Smith* Court held that telephone users had no subjective expectation of privacy in dialed telephone numbers contained in telephone companies' records.  *Id.* at 742–44.  While the government's position is not without persuasive force, it does not ultimately prevail.

21

The Third Circuit considered this argument in *In re Electronic Communications Service to Disclose*, *supra*. As that circuit noted, the Supreme Court in *Smith* reasoned that phone subscribers "assumed the risk that the company would reveal to police the numbers [they] dialed." 442 U.S. at 744. *See also* 620 F.3d at 304. The reasoning in *Smith* depended on the proposition that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," 442 U.S. at 743–44. The Third Circuit went on to observe that "a cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way." That circuit further noted that "it is unlikely that cell phone customers are aware that their cell phone providers collect and *store historical location information*." 620 F.3d at 317 (emphasis added). Therefore, as the Third Circuit concluded, "when a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed, and there is no indication to the user that making that call will also locate the caller." *Id.* Even more persuasively, "when a cell phone user receives a call, he hasn't voluntarily exposed anything at all." *Id.* at 317–18.

Supportive of this proposition is the argument made by the United States to the jury. The prosecutor stated to the jury "that obviously Willie Smith, like [Davis], probably had no idea that by bringing their cell phones with them to these

22

robberies, they were allowing [their cell service provider] and now all of you to follow their movements on the days and at the times of the robberies . . . ."  Just so. Davis has not voluntarily disclosed his cell site location information to the provider in such a fashion as to lose his reasonable expectation of privacy.

In short, we hold that cell site location information is within the subscriber's reasonable expectation of privacy.  The obtaining of that data without a warrant is a Fourth Amendment violation.  Nonetheless, for reasons set forth in the next section of this opinion, we do not conclude that the district court committed a reversible error.

II.  *The* Leon *Exception*

The United States contends that even if we conclude, as we have, that the gathering of the cell site location data without a warrant violated the constitutional rights of the defendant, we should nonetheless hold that the district court did not commit reversible error in denying appellant's motion to exclude the fruits of that electronic search and seizure under the "good faith" exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897 (1984).  We agree.

In *Leon*, the Court observed that "'[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional

23

under the Fourth Amendment.'" *Id.* at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).  In *Leon*, the Supreme Court reviewed the exclusion of evidence seized "by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause."  468 U.S. at 900.  The High Court held that "when an officer acting with objective good faith has obtained a search warrant from a judge . . . and acted within its scope," the exclusionary rule should not be employed to "[p]enaliz[e] the officer for the magistrate's error."  *Id.* at 920–21.  As the Court observed in *Leon*, such an application of the exclusionary rule "cannot logically contribute to the deterrence of Fourth Amendment violations."  *Id.*

The only differences between *Leon* and the present case are semantic ones. The officers here acted in good faith reliance on an order rather than a warrant, but, as in *Leon*, there was a "judicial mandate" to the officers to conduct such search and seizure as was contemplated by the court order.  *See id.* at 920 n.21.  As in *Leon*, the officers "had a sworn duty to carry out" the provisions of the order.  *Id.* Therefore, even if there was a defect in the issuance of the mandate, there is no foundation for the application of the exclusionary rule.

We further add that *Leon* speaks in terms of the "magistrate's" error.  Here, the law enforcement officers, the prosecution, and the judicial officer issuing the order, all acted in scrupulous obedience to a federal statute, the Stored

24

Communications Act, 18 U.S.C. § 2703.  At that time, there was no governing authority affecting the constitutionality of this application of the Act.  There is not even allegation that any actor in the process evidenced anything other than good faith.  We therefore conclude that under the *Leon* exception, the trial court's denial of the motions to suppress did not constitute reversible error.

III.  *Prosecutorial Misconduct*

Appellant argues that the trial prosecutor, in his summation to the jury, engaged in improper behaviors that irreparably tainted Davis's trial.  While he refers to several parts of the argument, the two that typify his argument were the prosecutor's reference to a substance, perhaps blood, being "all over" a getaway car, when in fact there were only a few drops; and what appellant describes as "long strings of bolstering witnesses' testimony."  We have reviewed the trial transcript of the closing argument and conclude that the prosecutor's statements warrant no relief on appeal.

As to the statements described by Davis as exaggeration of the evidence, we see no more than rhetorical flourish.  The prosecution could, without violating Davis's rights, characterize the evidence as could the defense counsel in presenting Davis's case.  The bolstering is admittedly troubling.

25

The problem of a prosecutor's vouching for government witnesses is indeed a very real one. In *United States v. Young*, 470 U.S. 1, 18–19 (1985), the Supreme Court observed that prosecutorial vouching

> can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

The Supreme Court's analysis of the prosecutor's role draws a clean line. He may comment on the evidence before the jury, but he may not augment that evidence by implication that he or others on the prosecution team are aware of further evidence not presented in court. While we recognize that in the heat of the courtroom, an arguing lawyer may say things he would later regret, the record in this case discloses that the prosecutor did cross that line. Specifically, he stated, with respect to the government witness Martin, "he came clean and confessed [one hundred] percent and told the police precisely the same story that he told all of you, the story he has told me one hundred times since."

The evidence before the jury certainly did not demonstrate that Martin had told the prosecutor the same story one hundred times since his original confession. The government argued to us that the phrase "one hundred times" is only a colloquialism and that the argument "relied on facts in evidence." Appellee's Br.

at 33.  We cannot agree with this styling, but nonetheless conclude that there is no ground for reversal here.

Prosecutorial misconduct will result in reversal only in those instances in which the misbehavior is so pervasive as to "permeate the entire atmosphere of the trial."  *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987).  We proceed under a two-part test.  First, the comments at issue must actually be improper, and second, any comments found to be improper must prejudicially affect the substantial rights of the defendant.  *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011).

We conclude that no such prejudicial effect is present.  The improper remark here is a small item following a dense record of evidence against the defendant, and evidence which in fact included prior consistent statements by the witness Martin.

Further, and of great importance, the district court removed the comments from the jury's consideration and properly instructed the jurors on the nature of closing arguments.  The court instructed that the prosecutor's statements were "not in evidence, and even if [they were], that doesn't make [them] true or not true."  We must presume that a jury follows its instructions.  *Richardson v. Marsh*, 481 U.S. 200 (1987).  In short, the prosecutor's statements are not a basis for reversal.

IV. *The Sentencing Enhancements*

Davis raises two constitutional objections to the computation of his sentence. He contends that the enhancement for the second or subsequent offenses and for brandishing a weapon were imposed in violation of his Sixth Amendment right to trial by jury; the underlying facts, in the one case "subsequence," and in the second case "brandishing," were not found by a jury beyond a reasonable doubt. Upon review, we conclude that his claim warrants no relief as to the second or subsequent enhancement, but is meritorious on the brandishing issue.

This sort of Sixth Amendment claim is governed by the Supreme Court decision in *United States v. Alleyne*, ___ U.S. ___, 133 S. Ct. 2151 (2013). In *Alleyne*, the Supreme Court overruled its prior opinion in *Harris v. United States*, 536 U.S. 545, 551–56 (2002), and held that the Sixth Amendment requires any fact which increases a mandatory minimum sentence to be submitted to the jury. *Alleyne*, 133 S. Ct. at 2162–63. However, the *Alleyne* decision does not warrant relief on the "second or subsequent" mandate for consecutive sentences. *Alleyne* relied heavily on *United States v. Apprendi*, in which the Court specifically excluded the fact of a prior conviction from its general holding requiring a jury to pass on those issues increasing the penalty beyond a statutory maximum. 530 U.S. 466, 490. In *Alleyne*, the Court declined to reconsider its holding in *Almendarez-Torrez v. United States*, 523 U.S. 224 (1998), that the fact of a prior conviction

28

need not be treated as an element of an offense. *Alleyne*, 133 S. Ct. at 2160 n.1. It follows, then, that we may not revisit this holding either.

The jury did not make a specific finding that the convictions for Counts 5, 7, 9, 11, 14, and 17 were second or subsequent convictions under 18 U.S.C. § 924(c). However, there is no *Alleyne* violation where the judicial finding is the fact of a prior conviction, a finding the jury need not make. In any event, the superseding indictment charged Davis separately as to each of the seven robberies that occurred on separate days. By virtue of logic, each of Counts 5, 7, 9, 11, 14, and 17 was second or subsequent when the jury found that they were committed as set forth in the superseding indictment. We can offer no relief based on Davis's contention that a concurrently found conviction should be treated differently for Sixth Amendment purposes from a conviction which predates the indictment in the current case. He cites *United States v. Shepard*, 544 U.S. 13, 26 (2005), but *Shepard* does not speak to the issue before us. It discusses only the types of documents a sentencing court can consider. Accordingly, the district court did not err in sentencing Davis to consecutive mandatory terms of imprisonment based on its finding that his convictions were second or subsequent enhancements within the meaning of 18 U.S.C. § 924(c).

The "brandishing" issue, however, does warrant relief. Although Davis did not raise the issue below, an appellate court can review for errors not raised at trial

29

under the "plain error" standard.  Under that standard, we may correct the error that the defendant did not raise only if there is "(1) error, (2) that is plain, and (3) that affects substantial rights."  *United States v. McKinley*, 732 F.3d 1291, 1295 (11th Cir. 2013).  If these three elements are met, we may then in our discretion correct the error, only if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.*  For example, the fourth prong of plain error review would not be met "where the evidence of a statutory element of an offense is overwhelming and essentially uncontroverted."  *Id.* at 1297.

A sentencing decision is in error when it violates a relevant Supreme Court ruling.  *See United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).  An error is plain if it is "clear from the plain meaning of a statute or constitutional provision, or from a holding of the Supreme Court or this Court."  *United States v. Pantle*, 637 F.3d 1172, 1174–75 (11th Cir. 2011).  An error affects substantial rights if it affected the outcome of the district court proceedings.  *Rodriguez*, 398 F.3d at 1299.  The defendant bears the burden of persuasion to demonstrate such prejudice.  *Id.*  Finally, we consider whether the error had such an effect on the proceedings as to motivate use of our discretion to restore the equality and reliability of judicial proceedings in the eyes of the public.  *United States v. Shelton*, 400 F.3d 1325, 1332–33 (11th Cir. 2005).

30

On Count 3, the jury found that Davis "possessed a firearm in furtherance of the robbery." At the sentencing hearing, the district court heard from the probation officer, who reported that "Count 3, which is possession of a firearm in furtherance of a crime of violence . . . calls for a minimum imprisonment sentence of seven years . . . ." The district court imposed then "84 months [seven years] as to Count 3 to be served consecutively to the terms imposed as to [the other counts]." The text of 18 U.S.C. § 924(c)(1)(A)(ii) requires that "if the firearm is brandished, [the defendant] be sentenced to a term of imprisonment of not less than 7 years." For possession, the applicable sentence is "a term of imprisonment of not less than 5 years." § 924(c)(1)(A)(i). The district court's finding vis á vis Count 3 is therefore inconsistent with the superseding indictment's charge, and the jury's finding, of possession rather than brandishing.

In reviewing the prejudicial effect of the deviation, we note that the district judge candidly stated that if he were not constrained by statutory maxima, he "would impose a sentence here that would not be a life sentence." It therefore appears that the extra length on this count would not have been imposed in the absence of what we now view as a plain error. Additionally, we also find that this error "affected the fairness, integrity, or public reputation of the judicial proceedings." *McKinley*, 732 F.3d at 1297. The evidence that Davis personally brandished the firearm he possessed during the robbery of the Little Caesar's

31

restaurant is not "overwhelming and essentially uncontroverted." *Id.* To the contrary, only one witness testified that a gun was pointed at her, and there is no evidence that Davis was the one who did it. Further, the jury had an opportunity to convict Davis of either (1) possessing a firearm in furtherance of the robbery or (2) using or carrying a firearm in furtherance of the robbery. Yet it only found that Davis possessed a firearm. We therefore will be constrained to vacate the extension of the sentence. In doing so, we observe on behalf of both the judge who entered the sentence and the counsel who did not raise the error that the trial in this case preceded the Supreme Court decision in *Alleyne*.

V. *Eighth Amendment Claim*

Davis argues that the 162-year sentence, which obviously amounts to a life sentence, constitutes cruel and unusual punishment. In support of this proposition, he stresses that he was eighteen and nineteen years old at the time of the commission of the offenses, and suffered from bipolar disorder and a severe learning disability, and had no prior convictions. While these are no doubt significant factors, we can grant no relief on this issue.

Allegations of cruel and unusual punishment are legal questions subject to our *de novo* review. *United States v. Haile*, 685 F.3d 1211, 1222 (11th Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 1723 (2013).

Davis argues that the mandatory consecutive nature of his sentence violated

the Eighth Amendment's prohibition on cruel and unusual punishment. He views his sentence, totaling nearly 162 years, as grossly disproportionate when considering his youth, intellectual disability, and emotional maturity, and as especially harsh for a non-homicide offense. For its part, the Government relies on the rarity of successful proportionality cases for adult offenders outside the capital context.

As applied to noncapital offenses, the Eighth Amendment encompasses at most only a narrow proportionality principle. *United States v. Brant*, 62 F.3d 367, 368 (11th Cir. 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991)). We accord substantial deference to Congress: "In general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." *United States v. Johnson*, 451 F.3d 1239, 1243 (11th Cir. 2006) (quotation omitted). We must first make the determination whether a total sentence is grossly disproportionate to the offenses committed. *Id.* In *United States v. Farley*, 607 F.3d 1294, 1339 (11th Cir. 2010), we held that the mandatory nature of a noncapital penalty is irrelevant for proportionality purposes, and observed that we have never found a term of imprisonment to violate the Eighth Amendment. *Id.* at 1343. Nor do we do so now.

Here, Davis's total sentence is unmistakably severe. However, a gross proportionality analysis necessarily compares the severity of a sentence to the

crimes of conviction, and Davis's crimes were numerous and serious.  Multiple victims experienced being robbed and threatened with a handgun.  Davis's use of a handgun entailed a risk or severe injury or death.  Trial testimony established that Davis shot at a dog,  and actually exchanged fire with a witness following the Wendy's robbery.  We cannot conclude that such repeated disregard for the law and for victims should overcome Congress's determination of what constitutes an appropriate sentence, even when Eighth Amendment concerns are implicated.

VI. *Sufficiency of the Evidence on Count 17*

Davis contends that the district court erred by denying his motion for judgment of acquittal on Count 17 because, in his view, the evidence failed to establish that he facilitated a codefendant's use of a firearm during the Mayor's Jewelry Store robbery.  We disagree.

We review *de novo* the district court's denial of a motion for a judgment of acquittal on sufficiency of evidence grounds.  *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007).  We consider the evidence in the light most favorable to the Government and draw all reasonable inferences and credibility choices in the Government's favor.  *United States v. Friske*, 640 F.3d 1288, 1290–91 (11th Cir. 2011).

Davis argues that there is insufficient evidence to support his conviction on Count 17 of the superseding indictment, which charges aiding and abetting a

codefendant's possession of a firearm during the jewelry store robbery.  In his estimation, the evidence does not show that he had prior knowledge of any gun before the jewelry store robbery.  In fact, he tells us, the evidence establishes that he was not involved in the planning of the robbery, precluding his prior knowledge of the firearm.  At most, the jury intuited that Davis had prior knowledge of the gun, which is an insufficient basis on which to sustain his conviction.

The Government argues that a reasonable construction of the evidence demonstrates that Davis knew his codefendant would be carrying a gun during the jewelry store robbery and that Davis enjoyed the protection of the firearm during the commission of the robbery.  According to the Government, its evidence constitutes a showing sufficient to support a conviction for aiding and abetting a codefendant's possession of a firearm.

Recently, the Supreme Court decided *Rosemond v. United States*, __ U.S. __, 134 S. Ct. 1240 (2014), in which it clarified the standard regarding the precise question before us: What must the Government show when it seeks to establish that a defendant is guilty of aiding or abetting the offense of using or carrying a firearm during a crime of violence?  In *Rosemond*, the Court held that the Government must prove that the defendant "actively participated in the underlying . . . violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission." *Rosemond*, 134 S. Ct. at 1243.

35

The Government, as part of its sufficiency argument, notes that Davis must have seen the gun during the robbery, and thus the knowledge element is met. We note that under *Rosemond*, such a scenario may constitute insufficient evidence if it means that Davis "at that late point ha[d] no realistic opportunity to quit the crime." *Rosemond*, 134 S. Ct. at 1249. However, Davis does not argue his inability to retreat, and regardless, this point is beyond the scope of our analysis. We need only decide whether Davis had the requisite "advance knowledge" described in *Rosemond*.

After *Rosemond*, and considering the evidence in the light most favorable to the Government, a reasonable construction of the evidence supports conviction on Count 17. The Government established that Davis drove from Miami-Dade County to the robbery site in Broward County with his codefendant, Fisher, who was the gunman. Both Davis and Fisher sat in the backseat, and the driver of the car turned and handed Fisher the handgun that would be used during the robbery. We agree with the Government and the district court that the jury could reasonably infer Davis's knowledge of the gun, based on its evaluation of the evidence as tending to demonstrate that Davis saw the gun in the car. Likewise, the jury may have inferred knowledge based on its finding that Davis participated in prior robberies, or that he assisted in planning the jewelry store robbery. We leave the

36

jury's finding on aiding and abetting in Count 17 undisturbed, as it was based on sufficient evidence.

VII.  *Accumulation of Trial Errors Claim*

We need not linger long over Davis's final claim.  Davis contends that we should grant relief where "a combination of trial errors and prosecutorial misconduct [denies] a defendant a fair trial, regardless of whether the individual errors require reversal on their own."  Appellant's Br. at 42 (citing *United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989)).  This is clearly correct as an abstract proposition of law, but it does not apply to this case.

Our precedent counsels that a combination of trial errors and prosecutorial misconduct can serve to render a trial unfair, despite no single error requiring reversal.  *Id.* at 787.  However, such a combination is rare because "a conviction should be reversed only if 'a miscarriage of justice would otherwise result.'"  *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).  This is not one of those rare cases.

As we make clear in our discussion above, the limited misconduct by the prosecutor was  readily cured by the instruction of the trial court.  The only cognizable error by the trial court is the admission of the cell site location information, which was at best understandable, given the uncertainty of the law on the subject, and at worst harmless, given that the evidence was admissible against

37

Davis, albeit on a different theory (the *Leon* exception) than that on which it was propounded.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of conviction and vacate only that portion of the sentence attributable to the enhancement for brandishing.