HULL, Circuit Judge:
I. BACKGROUND
Appellant Quartavius Davis[1] was convicted by a jury on several counts of Hobbs Act robbery, 18 U.S.C. § 1951(b)(1), (3), conspiracy, id. § 1951(a), and knowing possession of a firearm in furtherance of a crime of violence, id. §§ 924(c)(1)(A)(ii), 2. The district court entered judgment on the verdict, sentencing Davis to consecutive terms of imprisonment 'totaling 1,941 months. In this appeal, we are called on to decide whether the court order authorized by the Stored Communications Act, id. § 2703(d), compelling the production of a third-party telephone company’s business records containing historical cell tower location information, violated Davis’s Fourth Amendment rights and was thus unconstitutional. We hold it did not and was not.
Therefore, the district court did not err in denying Davis’s motion to suppress and we affirm Davis’s convictions. We reinstate the panel opinion, United States v. Davis, 754 F.3d 1205 (11th Cir.), reh’g en bane granted, opinion vacated, 573 Fed. Appx. 925 (11th Cir.2014), with respect to all issues except those addressed in Parts I and II, 754 F.3d at 1210-18, which are now decided by the en banc court.[2]
A. Seven Armed Robberies in a Two-Month Period
Quartavius Davis committed seven separate armed robberies in a two-month period. From the beginning of August 2010 to the beginning of October 2010, Davis and accomplices, bearing an array of firearms, terrorized a wide range of South Florida businesses, including a pizzeria, a gas station, a drugstore, an auto parts store, a beauty salon, a fast food restaurant, and a jewelry store.
On February 18, 2011, a federal grand jury returned a seventeen-count indictment against Davis and five codefendants. Davis was named in sixteen of the seventeen counts. The indictment charged violations of the Anti-Racketeering Act, 18 U.S.C. § 1951 (Hobbs Act), and conspiracy to violate the Hobbs Act. The indictment specifically charged Davis with conspiracy to engage in Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts 1, 15); seven Hobbs Act armed robberies, in violation of 18 U.S.C. §§ 1951(a), 2 (Counts 2, 4, 6, 8, 10, 13, 16); and knowingly using, carrying, and possessing a firearm in fur *501 therance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), 2 (Counts 3, 5, 7, 9,11,14,17).
All of Davis’s codefendants pled guilty to various counts. Davis alone went to trial. The jury convicted Davis on all charged counts.
At trial, the prosecution offered evidence of two conspiracies to commit Hobbs Act robbery and evidence that Davis took part in each conspiracy and each robbery. The prosecution further presented evidence that the conspirators committed such robberies. One member of each conspiracy testified for the government. Codefendant Willie Smith (“Smith”) testified as to the first conspiracy, encompassing six robberies at commercial establishments, including a Little Caesar’s restaurant, an Amerika Gas Station, a Walgreens drug store, an Advance Auto Parts store, a Universal Beauty Salon, and a Wendy’s restaurant. Codefendant Michael Martin (“Martin”) testified as to the second conspiracy, encompassing the robbery of a Mayors Jewelry store. Smith and Martin testified that Davis was involved in each robbery, where they wore masks, carried guns, and stole items such as cash, cigarettes, and watches.
Separately, an eyewitness, Edwin Negron, testified regarding Davis’s conduct at the Universal Beauty Salon and the adjacent martial arts studio. He testified that Davis pointed a gun at his head, pushed both a 77-year-old woman and Negron’s wife to the ground, and took several items from Negron and others. Another eyewitness, Antonio Brooks, testified that Brooks confronted Davis and his accomplices outside the Wendy’s after that robbery. Brooks testified that Davis fired a gun at Brooks, and that Brooks returned fire towards the getaway car.
Beyond the accomplice and eyewitness testimony, the government produced additional evidence. Surveillance videos showed a man matching Davis’s description participating in the robberies at Walgreens, Advance Auto Parts, Wendy’s, and Mayors Jewelry. Smith and Martin identified Davis on the videos. DNA shown to be Davis’s was recovered from the getaway car used to flee the scene of -the Universal Beauty Salon robbery and the Mayors. Jewelry store robbery.
In addition, the prosecution introduced telephone records obtained from MetroPCS for the 67-day period from August 1, 2010, through October 6, 2010, the time period spanning the first and last of the seven armed robberies.[3] The toll records show the telephone numbers for each of Davis’s calls and the number of the cell tower that connected each call. A MetroPCS witness identified his company’s cell tower glossary, which lists the physical addresses, including longitude and latitude, of MetroPCS’s cell towers. A police witness then located on a map the precise addresses (1) of the robberies and (2) of the cell towers connecting Davis’s calls around the time of six of the seven robberies. While there was some distance between them, the cell tower sites were in the general vicinity of the robbery sites.
The location of the cell user, though, is not precise. The testimony tells us (1) the cell tower used will typically be the cell tower closest to the user, (2) the cell tower has a circular coverage radius of varying sizes, and (3) although the tower sector ' number indicates a general direction (North, South, etc.) of the user from the tower, the user can be anywhere in that *502 sector. Despite this lack of precision as to where Davis’s cell phone was located, the cell tower evidence did give the government a basis for arguing calls to and from Davis’s cell phone were connected through cell tower locations that were near the robbery locations, and thus Davis necessarily was near the robberies too.
This appeal concerns the introduction of MetroPCS’s toll records and glossary as evidence against Davis at trial. We thus review in more detail how the government acquired MetroPCS’s records, the types of data in the records, and the witnesses’ testimony about the records.
B. Court Order Regarding MetroPCS Business Records
After Davis’s arrest, the government acquired MetroPCS’s business records by court order. In February 2011, the government applied to a federal magistrate judge for a court order directing various phone companies to disclose stored telephone communications records for four subject telephone numbers that included a number ending in 5642 (the “5642 number”). The application requested production of stored “telephone subscriber records” and “phone toll records,” including the “corresponding geographic location data (cell site),” for the 5642 number. The government requested only records “for the period from August 1, 2010 through October 6, 2010.” The government sought clearly-delineated records that were both historical and tailored to the crimes under investigation.
The government did so following the explicit design of the governing statute, the Stored Communications Act (“SCA”), 18 U.S.C. § 2701 et seq. Section 2703 of the SCA provides that a federal or state governmental entity may require a telephone service provider to disclose “a record ... pertaining to a subscriber to or a customer of such service (not including the contents of communications)” if “a court of competent jurisdiction” finds “specific and articulable facts showing that there are reasonable grounds to believe” that the records sought “are relevant and material to an ongoing criminal investigation.” Id. § 2703(c)(1)(A), (B), (d). The court order under subsection (d) does not require the government to show probable cause.
No one disputes that the government’s § 2703 application to the magistrate judge contained '“specific and articulable facts” showing “reasonable grounds” to believe MetroPCS’s business records — pertaining to Davis’s 5642 cell phone number — were “relevant and material” to the government’s investigation. The government’s § 2703 application provided a detailed summary of the evidence implicating Davis in the seven robberies, including post-Miranda statements from two accomplices and the DNA evidence found in two getaway cars. Undisputedly, a sufficient showing was made to satisfy the SCA’s statutory requirements.
The magistrate judge’s order granted the § 2703 application. The court order required MetroPCS, the third-party cellular telephone service provider, to produce “all telephone toll records and geographic location data (cell site)” for the 5642 number during the period August 1, 2010 through October 6, 2010.
MetroPCS complied. For this two-month time period, MetroPCS produced its stored telephone records for number 5642 showing these five types of data: (1) telephone numbers of calls made by and to Davis’s cell phone; (2) whether the call was outgoing or incoming; (3) the date, time, and duration of the call; (4) the number assigned to the cell tower that wirelessly connected the calls from and to Davis; and (5) the sector number associated with that tower. For ease of reference, *503 the fourth and.fifth items are collectiyely called “historical cell tower location information.”
Importantly though, MetroPCS’s business records did not show (1) the contents of any call; (2) the contents of any cell phone; (3) any data at all for text messages sent or received; or (4) any cell tower location information for when the cell phone was turned on but not being used to make or receive a call. The government did not seek, nor did it obtain, any GPS or real-time (also known as “prospective”) location information.
Before trial, Davis moved to suppress MetroPCS’s business records for number 5642. Although the government obtained them through a statutorily-prescribed judicial order, ■ Davis argued the evidence should be suppressed because the .§ 2703(d) production of MetroPCS’s records constituted a search under the Fourth Amendment and thus required probable cause and a search warrant. The district court denied the motion.[4]
C. Evidence at Trial
During the jury trial, the government introduced the MetroPCS records for the 5642 number, which was registered to “Lil Wayne.”[5] The government also introduced evidence tying Davis to the 5642 phone number. One of Davis’s codefendants testified that Davis used the 5642 number from August 2010 to October 2010. And a codefendant’s cell phone, which was entered into evidence, listed the 5642 number under Davis’s nickname, “Quat,” in the phone’s contact list.[6]
Michael Bosillo, a custodian of records from MetroPCS, identified and testified about the business records regarding number 5642. He testified that MetroPCS’s toll records, described above, are created and maintained in the regular course of its business.
As to cell tower location, Bosillo explained that, when a cellular phone user makes a call, the user’s cell phone sends a signal to a nearby cell tower, which is typically but not always the closest tower to the phone.. Two people driving together in the same car might be using different cell towers at the same time. Each cell phone tower has a circular coverage radius, and the “coverage pie” for each tower is further divided into either three or six p.arts, called sectors.
Bosillo testified that a cell tower would generally have a coverage radius of about one to one-and-a-half miles and that an individual cell phone user could- “be anywhere” in the specified sector of a given cell tower’s range. Bosillo also testified that the density of cell towers in an urban area like Miami would make the coverage of any given tower smaller, but he never said how much smaller.[7]
*504 Bosillo also testified that the toll records for Davis’s cell number 5642 show only (1) the number of the cell tower used to route Davis’s call, and (2) the sector number associated with that tower. Thus, to determine the location of any cell tower used, Bosillo identified and explained the cell tower glossary created and kept by MetroPCS. The MetroPCS glossary listed (1) each of its cell tower numbers, (2) the physical address, including latitude and longitude, of that cell tower, and (3) how many sectors are within each cell tower’s range.
This MetroPCS glossary, along with its toll records, allowed the government to determine the precise physical location of the cell towers that connected calls made by and to Davis’s cell phone around the time of the robberies, but not the precise location of that cell phone or of Davis.
Davis objected to the introduction of the toll records for the account corresponding to the 5642 number, the subscriber records, and MetroPCS’s cell-tower glossary. The district court overruled those objections.
The government also introduced into evidence maps that showed the locations of six of the armed robberies in relation to certain cell towers. Detective Mitch Jacobs examined the records, analyzing the records only for the days the armed robberies occurred. Detective Jacobs had, at that time, been employed by the MiamiDade Police Department for 27 years and for the last ten years had worked with cases involving cell tower location information. He had utilized cell tower location information for his investigations of homicides, parental kidnappings, robberies, fugitives, and various other types of crime.
Detective Jacobs created the maps introduced at trial based on MetroPCS’s records. These maps showed that, at or near the time of the armed robberies, cell phones linked to Davis and his codefendants made and received numerous calls routed through cell towers located in the general vicinity of the robbery locations. Detective Jacobs testified, and the maps showed, that this was true for six of the seven armed robberies. On the maps, Jacobs placed: (1) the location of the robberies and (2) the location of the cell towers that routed calls from Davis and his codefendants’ phones.[8]
The distance between the robbery and cell tower locations was never quantified. The distance between the cell user and the cell tower was never quantified, but the evidence — records and testimony — as a whole suggests Davis’s calls occurred within an area that covers at least several city blocks.' The government argued the cell tower evidence showed Davis was near the robberies when they occurred.
D. The Appeal
Following his convictions by the jury, Davis appealed. A panel of this Court affirmed his convictions, but held that the government violated Davis’s rights under the Fourth Amendment by obtaining stored telephone communications records from MetroPCS, a third-party telephone service provider, pursuant to the order of the magistrate judge issued under the *505 SCA, 18 U.S.C. § 2703(c)(1)(B), (d). United States v. Davis, 754 F.3d 1205, 1217 (11th Cir.2014). Nevertheless, the panel affirmed Davis’s convictions based on the good-faith exception to the exclusionary rule. Id. at 1217-18. This Court vacated the panel’s decision and granted the government’s petition for rehearing en banc. United States v. Davis, 573 Fed.Appx. 925 (11th Cir.2014).
II. STANDARD OF REVIEW
This Court reviews de novo constitutional challenges to a federal statute. United States v. Campbell, 743 F.3d 802, 805 (11th Cir.), cert. denied, — U.S. --, 135 S.Ct. 704, 190 L.Ed.2d 438 (2014). We review the district court’s legal conclusions de novo and its findings of fact for clear error. United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir.2011). In the context of an appeal from the denial of a suppression motion, all facts are construed in the light most favorable to the party prevailing below — here, the government. United States v. Gibson, 708 F.3d 1256, 1274 (11th Cir .2013).
III. DISCUSSION
On appeal, Davis argues the government violated his Fourth Amendment rights by obtaining historical cell tower location information from MetroPCS’s business records without a search warrant and a showing of probable cause. Davis contends that the SCA, as applied here, is unconstitutional because the Act allows the government to obtain a court order compelling MetroPCS to disclose its historical cell tower location records without a showing of probable cause. Davis claims the Fourth Amendment precludes the government from obtaining a third-party company’s business records showing historical cell tower location information, even for a single day, without a search warrant issued to that third party.
In the controversy before us, there is no GPS device, no physical trespass, and no real-time or prospective cell, tower location information. This case narrowly involves only (1) government access to the existing and legitimate business records already created. and maintained by a third-party telephone company and (2) historical information about which cell tower locations connected Davis’s cell calls during the 67-day time frame spanning the seven armed robberies. We start by reviewing the SCA, which authorized the production of MetroPCS’s business records.
A. The Statute
Under the SCA, Congress authorized the U.S. Attorney to obtain court orders requiring “a provider of electronic communication service ... to disclose a record or other information pertaining to a subscriber to ... such service (not including the contents of communications).” 18 U.S.C. § 2703(c). Section 2703 directs that a judge “shall issue” the order if the government “offers specific and articulable facts showing that there are reasonable grounds to believe that the ... records or other information sought[ ] are relevant and material to an ongoing criminal investigation.” Id. § 2703(d) (emphasis added). While this statutory standard is less than the probable cause standard for a search warrant, the government is still required to obtain a court order and present to a judge specific and articulable facts showing reasonable grounds to believe the records are relevant and material to an ongoing criminal investigation. See id.
The SCA does not lower the bar from a warrant to a § 2703(d) order. Rather, requiring a court order under § 2703(d) raises the bar from an ordinary subpoena to one with additional privacy protections *506 built in. The government routinely issues subpoenas to third parties to produce a wide variety of business records, such as credit card statements, bank statements, hotel bills, purchase orders, and billing invoices.[9] In enacting the SCA, Congress has required more before the government can obtain telephone records from a third-party business. The SCA goes above and beyond the constitutional requirements regarding compulsory subpoena process.
A number of the SCA’s privacy-protection provisions warrant mention. First, the SCA affords citizens protection by “interposing] a ‘neutral and detached magistrate’ between the citizen and the officer engaged in the often competitive enterprise of ferreting out crime.” See United States v. Karo, 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984) (internal quotation marks omitted). Congress made review by a judicial officer a pre-condition for the issuance of a § 2703(d) order. Moreover, the telephone records are made available only if a judicial officer finds (or the government shows) a factual basis for why the records are material to an ongoing criminal investigation.
In addition, the SCA generally prohibits telephone companies from voluntarily disclosing such records to “a governmental entity.” Id. § 2702(a)(3), (c)(4), (c)(6). As that prohibition underscores, a telephone company (like MetroPCS) would, absent privacy-protecting laws (like the SCA), be free to disclose its historical cell tower location records to governmental and nongovernmental entities alike — without any judicial supervision and without having to satisfy the statutory standard in § 2703(d).
Further, the SCA bars “[improper disclosure” of records obtained under § 2703(d). See id. § 2707(g). The SCA also provides remedies and penalties for violations of the Act’s privacy-protecting provisions, including money damages and the mandatory commencement of disciplinary proceedings against offending federal officers. See id. §§ 2707(a), (c), (d), 2712(a), (c).
Despite the SCA’s protections, Davis claims the court’s § 2703(d) order compelling the production of MetroPCS records violated his Fourth Amendment rights. To prevail on his Fourth Amendment claim, Davis must show both (1) that the application of the SCA to the facts of his case involved a “search” within the meaning of the Fourth Amendment, and (2) that such search was unreasonable. This Davis cannot do.
B. What Constitutes a “Search”
The Fourth Amendment guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. A party may establish a Fourth Amendment search by showing that the government engaged in conduct that “would have constituted a ‘search’ within the original meaning of the Fourth Amendment,” United States v. Jones, 565 U.S.-,-, 132 S.Ct. 945, 950 n. 3, 181 L.Ed.2d 911 (2012). “Search” originally was tied to common-law trespass and involved some trespassory intrusion on property. See, e.g., Kyllo v. United States, 533 U.S. 27, 31-32, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94 (2001).
Davis makes no trespass claim, nor could he.
*507 In 1967, the Supreme Court added a separate test — the reasonable-expectation-of-privacy test — to analyze whether a search occurred for purposes of the Fourth Amendment. See Smith v. Maryland, 442 U.S. 735, 739-40, 99 S.Ct. 2577, 2579-80, 61 L.Ed.2d 220 (1979) (citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The reach of the Fourth Amendment now does not turn on the presence or absence of a physical intrusion. Katz, 389 U.S. at 353, 88 S.Ct. at 512.
Thus, to determine whether the government’s obtaining access to MetroPCS’s records constitutes a search within the meaning of the Fourth Amendment, our lodestar is Katz’s reasonable-expectation-of-privacy test. Smith, 442 U.S. at 739, 99 S.Ct. at 2579-80 (citing Katz, 389 U.S. 347, 88 S.Ct. 507).
“Katz posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?” California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986). “Second, is society willing to recognize that expectation as reasonable?” Id. Thus, “a party alleging an unconstitutional search under the Fourth Amendment must establish both a subjective and an objective expectation of privacy to succeed.” United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995).
Notably, it was the interception and recording of conversations reasonably intended to be private that drove the new test and result in Katz. See 389 U.S. at 351-53, 88 S.Ct. at 511-12. The government recorded Katz’s conversations by attaching an electronic listening and recording device to the outside of a public phone booth in which Katz made calls. Id. at 348, 88 S.Ct. at 509. The government had no warrant or court order of any sort. See id. at 354-56, 88 S.Ct. at 512-514. The Supreme Court held that the government’s conduct in “electronically listening to and recording the petitioner’s words violated the privacy upon which he justifiably relied while using the telephone booth,” and thus constituted a “search and seizure” under the Fourth Amendment. Id. at 353, 88 S.Ct. at 512. The critical fact was that one who enters a telephone booth, “shuts the door behind him, and pays the toll that permits him to place a call” is entitled to assume that his conversation is not being intercepted and recorded. Id. at 352, 88 S.Ct. at 511-12; id. at 361, 88 S.Ct. at 516-17 (Harlan, J., concurring).
C. Third Party’s Business Records
In subsequently applying Katz’s test, the Supreme Court held — in both United States v. Miller and Smith v. Maryland— that individuals have no reasonable expectation of privacy in certain business records owned and maintained by a third-party business.
In United States v. Miller, during an investigation into tax fraud, federal agents presented subpoenas to the presidents of two banks, seeking to obtain from those banks all of Miller’s bank account records. 425 U.S. 435, 437-38, 96 S.Ct. 1619, 1621, 48 L.Ed.2d 71 (1976). The issue was whether the defendant Miller had a “legitimate expectation of privacy” in the documents’ contents. See id. at 440-43, 96 S.Ct. at 1622-24. The Supreme Court held that Miller had no protectable Fourth Amendment interest in the account records because the documents were: (1) business records of' transactions to which the banks were parties and (2) Miller voluntarily conveyed the information to the banks. Id. Miller had “neither ownership nor possession” over the papers and the records. Id. at 437, 440, 96 S.Ct. at 1621, 1623. Rather, the papers were “the busi *508 ness records of the banks.” Id. at 440-41, 96 S.Ct. at 1623. All of the bank records contained information “voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business.” Id. at 442, 96 S.Ct. at 1624. The Supreme Court noted “that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.” Id. at 443, 96 S.Ct. at 1624; see also In re Grand Jury Proceeding, 842 F.2d 1229, 1234 (11th Cir.1988) (“[A]n individual has no claim under the fourth amendment to resist the production of business records held by a third party.”).
Then, in Smith v. Maryland, the Supreme Court held that telephone users have no reasonable expectations of privacy in dialed telephone numbers recorded through pen registers and contained in the third-party telephone company’s records. 442 U.S. at 742-46, 99 S.Ct. at 2581-83. The Supreme Court determined that Smith had no subjective or objective expectation of privacy in the numbers he dialed on the telephone and thus the installation of the pen register, by the telephone company at the government’s request, did not constitute a search under the Fourth Amendment. Id.
As to the subjective expectation of privacy, the Supreme Court in Smith doubted that “people in general entertain any actual expectation of privacy in the numbers they dial” because “[a]ll telephone users realize that they must ‘convey’ phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed.” Id. at 742, 99 S.Ct. at 2581. The Supreme Court stated that “[telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes.” Id. at 743, 99 S.Ct. at 2581. “Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.” Id. The Supreme Court stressed that “a pen register differs significantly from the listening device employed in Katz, for pen registers do not acquire the contents of communications.” Id. at 741, 99 S.Ct. at 2581.
More telling in Smith though for this case is the location information revealed through the telephone records. Smith argued that, “whatever the expectations of telephone users in general, he demonstrated an expectation of privacy by his own conduct here, since he us[ed] the telephone in his house to the exclusion of all others.” Id. at 743, 99 S.Ct. at 2582 (internal quotation marks omitted). The Supreme Court expressly rejected Smith’s argument that he demonstrated an expectation of privacy in his own conduct here by using the telephone only in his house. The Supreme Court found that “[although [Smith’s] conduct may have been calculated to keep the contents of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed.” Id. The Supreme Court reasoned: “[r]egardless of his location, [Smith] had to convey that number to the telephone company in precisely the same way if he wished to complete his call. The fact that he dialed the number on his home phone rather than on some other phone could make no conceivable differ *509 ence, nor could any subscriber rationally think that it would.” Id.
As to the objective expectation of privacy, the Supreme Court determined that, “even if [Smith] did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not ‘one that society is prepared to recognize as reasonable.’ ” Id. (quoting Katz, 389 U.S. at 361, 88 S.Ct. at 516) (internal quotation marks omitted). The Supreme Court “consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.” Id. at 743-44, 99 S.Ct. at 2582. The Supreme Court found that, “[w]hen he used his phone, [Smith] voluntarily conveyed numerical information to the telephone company.” Id. at 744, 99 S.Ct. at 2582. The Supreme Court explained: “[t]he switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber.” Id.
In Smith, the Supreme Court decided that “a different constitutional result is [not] required because the telephone company has decided to automate.” Id. at 744-45, 99 S.Ct. at 2582. “The fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed does not in our view, make any constitutional difference.” Id. at 745, 99 S.Ct. at 2583. The Supreme Court concluded: “[Smith] in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and ... even if he did, his expectation was not ‘legitimate.’ ” Id.
D. Fifth Circuit Decision
Before turning to Davis’s case, we review the Fifth Circuit’s recent decision holding that a court order under § 2703(d) compelling production of business records — showing this same cell tower location information — does not violate the Fourth Amendment and no search warrant is required. In re Application of the United States for Historical Cell Site Data (“In re Application (Fifth Circuit)”), 724 F.3d 600, 611-15 (5th Cir.2013).[10] At the outset, the Fifth Circuit stressed who had collected the cell tower information. See id. at 609-10. The telephone company, not the government, collected the cell tower location information in the first instance and for a variety of legitimate business purposes. Id. at 611-12. The Fifth Circuit emphasized:
The Government does not require service providers to record this information or store it. The providers control what they record and how long these records are retained.... In the case of such historical cell site information, the Government merely comes in after the fact *510 and asks a provider to turn over records the provider has already created.
Id. at 612.
The Fifth Circuit reasoned these are the telephone company’s “own records of transactions to which it is a party.” Id. The telephone company created the record to memorialize its business transactions with the customer. Id. at 611-12. The Fifth Circuit was careful to define business records as records of transactions to which the record-keeper business is a party. See id. It also pointed out that these business records contained no content of communications, such as the content of phone calls, letters, or emails. Id.
After discussing the nature of the business records, the Fifth Circuit, relying on Smith, explained why the cell user had no subjective expectation of privacy in such business records showing cell tower locations. The court reasoned: (1) the cell user has knowledge that his cell phone must send a signal to a nearby cell tower in order to wirelessly connect his call; (2) the signal only happens when a user makes or receives a call; (3) the cell user has knowledge that when he places or receives calls, he is transmitting signals through his cell phone to the nearest cell tower and thus to his service provider; (4) the cell user thus is aware that he is conveying cell tower location information to the service provider and voluntarily does so when he uses his cell phone for calls. Id. at 613-14.
The Fifth Circuit concluded that “[c]ell phone users, therefore, understand that their service providers record their location information when they use their phones at least to the same extent that the landline users in Smith understood that the phone company recorded the numbers they dialed.” Id. at 613.[11] Just as the petitioner in Smith knew that when he dialed telephones, he was conveying and exposing those numbers to electronic equipment, cell phone users have knowledge they are conveying signals and exposing their locations to the nearest cell tower. Id. at 612-14.
The Fifth Circuit agreed “that technological changes can alter societal expectations of privacy,” but reasoned, “[a]t the same time, ‘[l]aw enforcement tactics must be allowed to advance with technological changes, in order to prevent criminals from circumventing the justice system.’ ” Id. at 614 (quoting United States v. Skinner, 690 F.3d 772, 778 (6th Cir.2012)). The Fifth Circuit concluded that “[a] legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.” Id. (quoting Jones, 565 U.S. at-, 132 S.Ct. at 964 (Alito, J., concurring)). In the end, the Fifth Circuit determined: (1) “Congress has crafted such a legislative solution in the SCA,” and (2) the SCA “conforms to existing Supreme Court Fourth Amendment precedent.” Id. The Fifth Circuit “decline[d] to create a new rule to hold *511 that Congress’s balancing of privacy and safety is unconstitutional.” Id. at 615.
E. Davis’s Case
Based on the SCA and governing Supreme Court precedent, we too conclude the government’s obtaining a § 2703(d) court order for the production of MetroPCS’s business records did not violate the Fourth Amendment.
For starters, like the bank customer in Miller and the phone customer in Smith, Davis can assert neither ownership nor possession- of the third-party’s business records he sought to suppress. Instead, those cell tower records were created by MetroPCS, stored on its own premises, and subject to its control. Cell tower location records do not contain private communications of the subscriber. This type of non-content evidence, lawfully created by a third-party telephone company for legitimate business purposes, does not belong to Davis, even if it concerns him. Like the security camera surveillance images introduced into evidence at his trial, MetroPCS’s cell tower records were not Davis’s to withhold. Those surveillance camera images show Davis’s location at the precise location of the robbery, which is far more than MetroPCS’s cell tower location records show.
More importantly, like the bank customer in Miller and the phone customer in Smith, Davis has no subjective or objective reasonable expectation of privacy in MetroPCS’s business records showing the cell tower locations that wirelessly connected his calls at or near the time of six of the seven robberies.
As to the subjective expectation of privacy, we agree with the Fifth Circuit that cell users know that they must transmit signals to cell towers within range, that the cell tower functions as the equipment that connects the calls, that users when making or receiving calls are necessarily conveying or exposing to their service provider their general location within that cell tower’s range, and that cell phone companies make records of cell-tower usage. See In re Application (Fifth Circuit), 724 F.3d at 613-14. Users are aware that cell phones do not work when they are outside the range of the provider company’s cell tower network. Id. at 613. Indeed, the fact that Davis registered his cell phone under a fictitious alias tends to demonstrate his understanding that such cell tower location information is collected by MetroPCS and may be used to incriminate him.
Even if Davis had a subjective expectation of privacy, his expectation of privacy, viewed objectively, is not justifiable or reasonable under the particular circumstances of this case. The unreasonableness in society’s eyes dooms Davis’s position under Katz. In Smith, the Supreme Court presumed that phone users knew of uncontroverted and publicly available facts about technologies and practices that the phone company used to connect calls, document charges, and assist in legitimate law-enforcement investigations. See 442 U.S. at 742-43, 99 S.Ct. at 2581. Cell towers and related records are used for all three of those purposes. We find no reason to conclude that cell phone users lack facts about the functions of cell towers or about telephone providers’ recording cell tower usage.
Smith’s methodology should not be set aside just because cell tower records may also be used to decipher the approximate location of the user at the time of the call. Indeed, the toll records for the stationary telephones at issue in Smith included location data far more precise than the historical cell site location records here, because the phone lines at issue in Smith corresponded to stationary landlines at known *512 physical addresses. At the time of Smith, telephone records necessarily showed exactly where the user was — his home — at the time of the call, as the user’s telephone number was tied to a precise address. And the number dialed was also tied to a precise address, revealing if the user called a friend, a business, a hotel, a doctor, or a gambling parlor.
In certain respects, Davis has an even less viable claim than the defendant in Miller. For example, the Supreme Court in Miller held that a customer did not have a reasonable expectation of privacy in records made and kept by his bank even where the bank was required by law to maintain those records. See Miller, 425 U.S. at 436, 440-41, 96 S.Ct. at 1621, 1623. Here, federal law did not require that MetroPCS either create or retain these business records.
Admittedly, the landscape of technology has changed in the years since these binding decisions ■ in Miller and Smith were issued. But their holdings did not turn on assumptions about the absence of technological change. To the contrary, the dispute in Smith, for example, arose in large degree due to the technological advance from call connections by telephone operators to electronic switching, which enabled the electronic data collection of telephone numbers dialed from within a home. See 442 U.S. at 744-45, 99 S.Ct. at 2582-83. The advent of mobile phones introduced calls wirelessly connected through identified cell towers. This cell tower method of call connecting does not require “a different constitutional result” just “because the telephone company has decided to automate” wirelessly and to collect the location of the company’s own cell tower that connected the calls. See id. at 744-45, 99 S.Ct. at 2582. Further, MetroPCS’s cell tower location information was not continuous; it was generated only when Davis was making or receiving calls on his phone. The longstanding third-party doctrine plainly controls the disposition of this case.[12]
The use of cell phones is ubiquitous now and some citizens may want to stop telephone companies from compiling cell tower location data or from producing it to the government. Davis and amici advance thoughtful arguments for changing the underlying and prevailing law; but these proposals should be directed to Congress and the state legislatures rather than to the federal courts. As aptly stated by the Fifth Circuit, “the recourse for these desires is in the market or the political process; in demanding that service providers do away with such records (or anonymize them) or in lobbying elected representatives to enact statutory protections.” In re Application (Fifth Circuit), 724 F.3d at 615; See also In re Application (Third Circuit), 620 F.3d at 319 (“The considerations for and against [§ 2703(d) orders not requiring a warrant] would be for Congress to balance. A court is not the appropriate forum for such balancing, and we decline to take a step as to which Congress is silent.”).
*513 Following controlling Supreme Court precedent most relevant to this case, we hold that the government’s obtaining a § 2703(d) court order for production of MetroPCS’s business records at issue did not constitute a search and did not violate the Fourth Amendment rights of Davis.[13]
F. United States v. Jones
Instead of focusing on the SCA and Smith, Davis relies on United States v. Jones, 565 U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), where the government surreptitiously attached a GPS device to a private vehicle and used its own device to track the vehicle’s movements over a four-week period. Id. at-, 132 S.Ct. at 948. In Jones, the Supreme Court held that the government’s physical intrusion on the defendant’s private property[14] was a “search” and violated the Fourth Amendment. Id. at-, 132 S.Ct. at 949. Significantly, the government-initiated physical trespass in Jones led to constant and real-time GPS tracking of -the precise location of the defendant’s vehicle. Id. at -, 132 S.Ct. at 948.[15] “The Government physically occupied private property for the purpose of obtaining information.” Id. at-, 132 S.Ct. at 949. The Supreme Court had “no doubt that such a physical intrusion would have been considered a ‘search’ within the meaning of the Fourth Amendment when' it was adopted.” Id.
The majority opinion in Jones acknowledged that “later cases, of course, have deviated from [an] exclusively property-based approach” and have adopted an alternative “reasonable expectation of privacy” standard. Id. at-, 132 S.Ct. at 950 (citing Katz, 389 U.S. at 351, 360, 88 S.Ct. at 511, 516 (majority opinion and opinion of Harlan, J., concurring)). But the result in Jones required nothing other than the property-based approach. Though the government argued Jones had no “reasonable expectation of privacy,” the Supreme Court majority determined it “need not address the Government’s contentions, because Jones’s Fourth Amendment rights d[id] not rise or fall with the Katz formulation.” Id.
Explaining the distinction, the majority opinion stressed that “the Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.” Id. at -, 132 S.Ct. at 952. But the majority holding in ■ Jones turned on the physical intrusion of the government placing a GPS device on a *514 private .vehicle. Id. at-, 132 S.Ct. at 949.
That is not this case. The government’s obtaining MetroPCS records, showing historical cell tower locations, did not involve a physical intrusion on private property or a search at all. The records belonged to a private company, not Davis. The records were obtained through a court order authorized by a federal statute, not by means of governmental trespass. MetroPCS, not the government, built and controlled the electronic mechanism (the cell towers) and collected its cell tower data for legitimate business purposes. Jones is wholly inapplicable to this case.
Davis and the dissent attempt to deploy the concurrences in Jones to argue that historical cell tower location data is the equivalent of GPS and constitutes the sort of precise, long-term monitoring requiring the government to show probable cause. This attempt misreads the concurrences. We review the concurrences in detail because they leave the third-party doctrine untouched and do not help Davis’s case. If anything, the concurrences underscore why this Court remains bound by Smith and Miller.
Justice Sotomayor concurred in the majority opinion, but was concerned because the government’s GPS monitoring had “generate[d] a precise, comprehensive record of a person’s public movements” and gave the government “unrestrained power to assemble data.” Id. at-, 132 S.Ct. ■ at 955-56. She found the “Resolution of [that] difficult question[]” was “unnecessary ... because the Government’s physical intrusion on Jones’ Jeep suppliefd] a narrower basis for decision.” Id. at-, 132 S.Ct. at 957 (emphasis added). In joining the majority’s opinion, she provided the fifth vote for the physical trespass holding. Id.
Justice Sotomayor did state: “it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.” Id. (citing Smith, 442 U.S. at 742, 99 S.Ct. at 2581; Miller, 425 U.S. at 443, 96 S.Ct. at 1624). But she quickly added and countered her own suggestion, stating: “[pjerhaps, as Justice ALITO notes, some people may find the ‘tradeoff of privacy for convenience ‘worthwhile,’ or come to accept this ‘diminution of privacy’ as ‘inevitable,’ post, at 962, and perhaps not.” Id. Justice Soto-mayor, writing alone, raised a question, but did not even purport to answer it.
Justice Alito’s concurrence further underscores why this Court is bound by Supreme Court precedent in Smith and Miller. Justice Alito concurred in the judgment and explained why the government-initiated, and government-controlled, real-time' constant GPS monitoring violated the Fourth Amendment. Id. at-, 132 S.Ct. at 957-64. Only the government did the tracking and its tracking was not authorized or regulated by a federal statute. See id. at-, 132 S.Ct. at 956 (Sotomayor, J., concurring); id. at -, 132 S.Ct. at 964 (Alito, J., concurring -in the judgment). Justice Alito’s focus is on unrestrained government power.
The context of his concurrence is critical. Nothing Justice Alito says contravenes the third-party doctrine. His concurring opinion does not question, or even cite, Smith, Miller, or the third-party doctrine in any way. The opinion never uses the words “third party” or “third-party doctrine.” It would be a profound change in jurisprudence to say Justice Alito was questioning, much less casting aside, the third-party doctrine without even mentioning the doctrine.
Further, Justice Alito’s concurrence speaks only at a high level of abstraction *515 about the government’s placement and control of an electronic GPS mechanism on a private vehicle that did the precise, real-time, and long-term monitoring. See id. at -, 132 S.Ct. at 962-64. In stark contrast, the mechanism in Davis’s case is MetroPCS’s own electronic mechanism— the cell tower. MetroPCS created and assembled the electronic data. The government obtained access only through judicial supervision and a court order. Nothing in Justice Alito’s concurrence in any way undermines the third-party doctrine. If anything, Justice Alito’s concurrence, joined by three others, suggests that a legislative solution is needed. Id. at -, 132 S.Ct. at 964 (“In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative. A legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.” (citation omitted)). At present, the SCA is that solution.
Not only are Davis and the dissent ignoring controlling law, but even the internal logic of their arguments fails.[16]
First, historical cell tower location, data is materially distinguishable from the precise, real-time GPS tracking in Jones, even setting aside the controlling third-party doctrine discussed above. Historical cell tower location data does not identify the cell phone user’s location with pinpoint precision — it identifies the cell tower that routed the user’s call. The range of a giv.en cell tower will vary given the strength of its signal and the number of other towers in the area used by the same provider. While the location of a user may be further defined by the sector of a given cell tower which relays the cell user’s signal, the user may be anywhere in that sector. This evidence still does not pinpoint the user’s location. Historical cell site location data does not paint the “intimate portrait of personal, social, religious, medical, and other activities and interactions” that Davis claims.
Second, reasonable expectations of privacy under the Fourth Amendment do not turn on the quantity of non-content information MetroPCS collected in its historical cell tower location records. The § 2703(d) order covered 67 days of MetroPCS records. In his brief before this en banc Court, Davis argued that the length of the records covered by the order made the production an unconstitutional “search.” But at oral argument Davis’s counsel firmly contended that even one day of historical cell tower location information would require a search warrant supported by probable cause. Counsel’s response at oral argument is faithful to Davis’s broader claim, but misapprehends the governing law. Because Davis has no reasonable expectation of privacy in the type of non-content data collected in MetroPCS’s historical cell tower récords, neither one day nor 67 days of such records, produced by court 'order, violate the Fourth Amendment.[17]
*516 As an extension of the argument above, Davis and various amici argue that cell tower data potentially implicating the home is due particular Fourth Amendment protection. In addition to noting the Supreme Court’s clear rejection of this argument as it concerned toll records in Smith, we find it useful to recount the manner in which the evidence about Davis’s home tower arose in this case.
On cross-examination by Davis’s trial counsel, Detective Jacobs was asked whether a person’s calls made from his or her home may be connected through a single cell tower — the “home tower.” Detective Jacobs responded that they may be. Defense counsel followed up, asking whether, “[o]n the other hand ... you might see more than one tower” even though the person remains in his or her house? Again, Detective Jacobs responded yes. At that time, defense counsel was arguing the imprecision of the data collected. Like two riders in the same car, a user’s calls from his home may be connected by different towers if more than one tower is located in range of the home. The government only discussed Davis’s home tower after it was introduced by the defense, and only did so to illustrate that none of the robberies were committed in the vicinity of the home tower.
MetroPCS produced 67 days of historical cell site location information for Davis’s cellular phone. Davis, a prolific cell phone user, made approximately 86 calls a day.[18] Without question, the number of calls made by Davis over the course of 67 days could, when closely analyzed, reveal certain patterns with regard to his physical location in the general vicinity of his home, work, and indeed the robbery locations. But no record evidence here indicates that the cell tower data contained within these business records produces precise locations or anything close to the “intimate portrait” of Davis’s life that he now argues.[19] The judicial system does not engage in monitoring or a search when it compels the production of preexisting documents from a witness.
G. Reasonableness
Even if this Court were to hold that obtaining MetroPCS’s historical cell tower locations for a user’s calls was a search and the Fourth Amendment applies, that would begin, rather than end, our analysis. Maryland v. King, 569 U.S. -, -, 133 S.Ct. 1958, 1969, 186 L.Ed.2d 1 (2013). The Fourth Amendment prohibits unreasonable searches, not warrantless searches. As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a gov *517 ernmental search is “reasonableness.” Fernandez v. California, 571 U.S. -, -, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014). “[A] warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either.” Veronica Sch. Dist. 47J v. Acton, 515 U.S. 646, 653, 115 S.Ct. 2386, 2390-91, 132 L.Ed.2d 564 (1995).
Simply put, the reasonableness of a search or seizure is evaluated “under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999). In addition, “there is a strong presumption of constitutionality due to an Act of Congress, especially when it turns on what is ‘reasonable’ ” within the meaning of the Fourth Amendment. United States v. Watson, 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976) (internal quotation marks omitted).
This traditional Fourth Amendment analysis supports the reasonableness of the § 2703(d) order in this particular case. As outlined above, Davis had no reasonable expectation of privacy in business records made, kept, and owned by MetroPCS. At most, Davis would be able to assert only a diminished expectation of privacy in MetroPCS’s records. See King, 569 U.S. at-, 133 S.Ct. at 1969 (identifying “diminished expectations of privacy” as one of the factors that “may render a warrantless search or seizure reasonable” (quotation marks omitted)).
Further, any intrusion on Davis’s alleged privacy expectation, arising out of MetroPCS’s production of its own records pursuant to a § 2703(d) order, was minimal for several reasons. First, there was no overhearing or recording of any conversations. Second, there is no GPS real-time tracking of precise movements of a person or Vehicle. Even in an urban area, MetroPCS’s records do not show, and the examiner cannot pinpoint, the location of the cell user. Ironically, Davis was using old technology and not the new technology of a smartphone equipped with a GPS real-time, precise tracking device itself.
Third, a § 2703(d) court order functions as a judicial subpoena, but one which incorporates additional privacy protections that keep any intrusion minimal. The SCA guards against the improper acquisition or use of any personal information theoretically discoverable from such records. See King, 569 U.S. at -, 133 S.Ct. at 1979-80. Under § 2703(d), investigative authorities may not request such customer-related records merely to satisfy prurient or otherwise insubstantial governmental interests. Instead, a neutral and detached magistrate must find, based on “specific and articulable facts,” that there are “reasonable grounds to believe” that the requested records are “relevant and material to an ongoing criminal investigation.” Such protections are sufficient to satisfy “the primary purpose of the Fourth Amendment,” which is “to prevent arbitrary invasions of privacy.” Brock v. Emerson Elec. Co., Elec. & Space Div., 834 F.2d 994, 996 (11th Cir.1987); see, e.g., Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 n.18, 392 U.S. 1, 88 S.Ct. 1868, 1880 n. 18, 20 L.Ed.2d 889 (1968) (explaining that the “demand for specificity in the information upon which police action is predicated is the central teaching of this Court’s Fourth Amendment jurisprudence”).
*518 The stored telephone records produced in this case, and in many other criminal cases, serve compelling governmental interests. Historical cell tower location records are routinely used to investigate the full gamut of state and federal crimes, including child abductions, bombings, kidnappings, murdfers, robberies, sex offenses, and terrorism-related offenses. See, e.g., United States v. Troya, 733 F.3d 1125, 1136 (11th Cir.2013) (“quadruple homicide” involving the “gangland-style murder of two children”); United States v. Mondestin, 535 Fed.Appx. 819, 821 (11th Cir.2013) (unpublished) (per curiam) (armed robbery); United States v. Sanders, 708 F.3d 976, 982-83 (7th Cir.2013) (kidnapping). Such evidence is particularly valuable during the early stages of an investigation, when the police lack probable cause and are confronted with multiple suspects. In such cases, § 2703(d) orders — like other forms of compulsory process not subject to the search warrant procedure — help to build probable cause against the guilty, deflect suspicion from the innocent, aid in the search for truth, and judiciously allocate scarce investigative resources.
The societal interest in promptly apprehending criminals and preventing them from committing future offenses is “compelling.” See United States v. Salerno, 481 U.S. 739, 750-51, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987). But so too is the societal interest in vindicating the rights of innocent suspects. See King, 569 U.S. at -, 133 S.Ct. at 1974. Both interests are heavily implicated when the government seeks to compel the production of evidence “relevant and material to an ongoing criminal investigation.” 18 U.S.C. § 2703(d). Cell tower location records have the capacity to tell the police investigators that an individual suspect was in the general vicinity of the crime scene or far away in another city or state.
In sum, a traditional balancing of interests amply supports the reasonableness of the § 2703(d) order at issue here. Davis had at most a diminished expectation of privacy in business records made, kept, and owned by MetroPCS; the production of those records did not entail a serious invasion of any such privacy interest, particularly in light of the privacy-protecting provisions of the SCA; the disclosure of such records pursuant to a court order authorized by Congress served substantial governmental interests; and, given the strong presumption of constitutionality applicable here, any residual doubts concerning the reasonableness of any arguable “search” should be resolved in favor of the government. Hence, the § 2703(d) order permitting government access to MetroPCS’s records comports with applicable Fourth Amendment principles and is not constitutionally unreasonable.[20]
IV. CONCLUSION
For the reasons set forth above, we affirm the judgment of conviction and vacate only that portion of the sentence attributable to the enhancement for brandishing.[21]

. The Presentence Investigation Report notes that “Quartavius” is the correct spelling of appellant's first name, despite the spelling in the caption.

. Davis's advisory guidelines range was 57 to 71 months’ imprisonment for his Hobbs Act robberies. However, each of his seven § 924(c) convictions required consecutive sentences. 18 U.S.C. § 924(c)(l)(D)(ii). The district court sentenced Davis to concurrent terms of 57 months' imprisonment on counts 1, 2, 4, 6, 8, 10, 13, 15, and 16, plus a consecutive term of 84 months on count 3, plus consecutive terms of 300 months' imprisonment on counts 5, 7, 9, 11, 14, and 17.
The panel opinion affirmed Davis’s convictions but vacated the application of the guidelines sentencing increase for "brandishing” of a firearm. Davis, 754 F.3d at 1220-21, 1223. To be clear, that disposition stands.

. The first robbery took place on August 7, 2010, and the final robbery took place on October 1, 2010.

. Davis did not present any evidence in support of his Fourth Amendment claim, either at ' the suppression hearing or at trial.

. MetroPCS had not required the subscriber Davis to give his true name. Instead, MetroPCS sells phones with monthly plans — averaging $40 a month — paid up front. When that plan expires, the subscriber pays another monthly payment up front or the plan is can-celled.

. The government also obtained MetroPCS records for three other cell phone numbers used by Davis's co-conspirators, which were registered under the alias names of "Nicole Baker,” "Shawn Jay,” and "Dope Boi Dime.” The issue before us involves only Davis’s cell phone number, the 5642 number registered to "Lil Wayne.” In this en banc appeal, Davis did not raise arguments about the other cell phone numbers.

.Davis and various amici argue that some cellular telephone companies have now increased their network coverage by augmenting their cell tower network with low-power small cells, or "femtocells,” which can cover *504 areas as small as ten meters. There is no evidence, or even any allegation, that the MetroPCS network reflected in the records in this case included anything other than traditional cell towers and the facts of this case do not require, or warrant, speculation as to the newer technology.

. The maps did. not show any cell tower’s coverage radius or display any cell tower’s sectors.

. See, e.g., United States v. Willis, 759 F.2d 1486, 1498 (11th Cir.1985) (motel registration records); United States v. Phibbs, 999 F.2d 1053, 1077 (6th Cir.1993) (credit card statements). Those statements not only show lo- . cation at the time of purchase, but also reveal intimate details of daily life, such as shopping habits, medical visits, and travel plans.

. The dissent mistakenly argues that we are faced with "persuasive ... authority on both sides of the debate.... ” Dissenting Op. at 534 n. 2. To purportedly illustrate this, the dissent cites a Third Circuit decision, but that decision did not hold, as the dissent would, that a search warrant is required to obtain historical cell tower location data. In re Application of U.S. for an Order Directing a Provider of Elec. Commc’n Serv. to Disclose Records to Gov’t (“In re Application (Third Circuit)"), 620 F.3d 304 (3d Cir.2010). Rather, after the lower courts denied the government’s § 2703(d) application for historical cell tower data, the government appealed and the Third Circuit actually vacated that denial. Id. at 319. The Third Circuit concluded that the SCA itself gave the magistrate judge the discretionary option to require a warrant showing probable cause and that the discretionary warrant option should "be used sparingly because Congress also included the option of a § 2703(d) order.” Id.
The dissent also cites a Florida Supreme Court decision, but that case involved real-time data and did not involve a § 2703(d) order. Tracey v. State, 152 So.3d 504, 507-08 (Fla.2014).

. In the Fifth Circuit case, the court stated that the “contractual terms of service and providers' privacy policies expressly state[d] that a provider uses a subscriber’s location information to route his cell phone calls” and, moreover, “that the providers not only use the information, but collect it.” In re Application (Fifth Circuit), 724 F.3d at 613. The government stresses that MetroPCS's privacy policy, accessible from the company website, plainly states that cell tower location data may be recorded, stored, and even shared with law enforcement. Although Davis would have signed a contract when beginning service with MetroPCS, that contract does not appear on this record to have been entered into evidence here. Thus we cannot consider it, or MetroPCS’s privacy policy, in this particular case.

. To avoid the third-party doctrine, the dissent claims that "[t]he extent of voluntariness of disclosure by a user is simply lower for cell site location data.” Dissenting Op. at 535. Not so. Cell phone users voluntarily convey cell tower location information to telephone companies in the course of making and receiving calls on their cell phones. Just as in Smith, users could not complete their calls without necessarily exposing this information to the equipment of third-party service providers. The government, therefore, did not search Davis when it acquired historical cell tower location information from MetroPCS. In order to reach its result, the dissent effectively would cast aside longstanding and binding Supreme Court precedents in favor of its own view of the Fourth Amendment.

.Rather than legal analysis, the dissent consists mainly of myriad hypothetical fact patterns and a tabloid-type parade of horribles. As the dissenting author well knows, our "decision can hold nothing beyond the facts of [this] case.” Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir.2010) (citing Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir.2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced.”); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) (“The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.” (quotation marks omitted))).

. The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV. "It is beyond dispute that a vehicle is an ‘effect’ as that term is used in the Amendment.” Jones, 565 U.S. at -, 132 S.Ct. at 949.

. The Supreme Court explained; “By means of signals from multiple satellites, the device established the vehicle’s location within 50 to 100 feet, and communicated that location by cellular phone to a Government computer. It relayed more than 2,000 pages of data over the 4-week period.” Jones, 565 U.S. at-, 132 S.Ct. at 948.

. The dissent remarks that we "ignore[] the opinion of five Justices of the Supreme Court at [our] own risk.” Dissenting Op. at 540, n. 7. Quite the contrary, the majority opinion has faithfully recounted the two concurring opinions in Jones in the factual context of the case actually decided by the Supreme Court. Furthermore, because Jones involved a government trespass and not the third-party doctrine, eight of the nine Justices did not write or join one word about the “third-party doctrine,” much less criticize it. It is the dissent that ignores, and fails to follow, binding Supreme Court precedent.

. The SCA necessarily limits the time span of telephone records for which the government may secure a court order, as the government must show that such records are "relevant *516 and material to an ongoing criminal investigation.” 18 U.S.C. § 2703(d).

. This number comes from an analysis of Davis’s cell phone usage by the American Civil Liberties Union in its capacity as amicus curiae in this case. While all 67 days of toll records were placed in evidence against Davis, the government witnesses analyzed Davis’s cell phone usage only for the seven days on which the armed robberies occurred.

. Davis now also argues that the Supreme Court’s recent decision in Riley v. California, 573 u.S. -, 134 S.Ct. 2473, 189 L.Ed'.2d 430 (2014), where law enforcement officers seized the cell phones of arrestees and then searched the contents of the phones without obtaining warrants, supports his claim of an unconstitutional search. Riley held that this warrantless search of the contents of a cell phone obtained incident to an arrest violated the Fourth Amendment. Id. at-, 134 S.Ct. at 2485. But the Supreme Court in Riley made a special point of stressing that the facts before it "do not implicate the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances.” Id. at-, 134 S.Ct. at 2489 n. 1. It is not helpful to lump together doctrinally unrelated cases that happen to involve similar modern technology.

. In the alternative, we hold that the prosecutors and officers here acted in good faith and therefore, under the well-established Leon exception, the district court's denial of the motion to suppress did not constitute reversible error. See United States v. Leon, 468 U.S. 897, 919-21, 104 S.Ct. 3405, 3418-19, 82 L.Ed.2d 677 (1984).

. Because there are multiple opinions, it may be helpful to summarize the final count. Nine members of the en banc court agree there was no Fourth Amendment violation in this case. Seven members of the court join the majority opinion. Two members of the court, Judges Wilson and Jordan, join the majority opinion as to its reasonableness holding.