Filed 12/8/15  P. v. Patterson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F067972 |
| Plaintiff and Respondent, | |
| v. | (Fresno Super. Ct. No. F11902827) |
| BRANDON MICHAEL PATTERSON et al., | **OPINION** |
| Defendants and Appellants. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant, Brandon Michael Patterson

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant, Robert Anthony Garcia.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants and Brandon Michael Patterson (Patterson) and Robert Anthony Garcia (Garcia) appeal from their judgments of conviction for murder, contending insufficient evidence supports them. Patterson also challenges the trial court's denial of his pretrial motion to suppress which was based on his claim law enforcement obtained the location of his cell phone without a warrant in violation of his Fourth Amendment rights.

We reject these contentions and affirm the judgments of conviction.

## BACKGROUND

On July 1, 2013, a jury convicted defendants Patterson and Garcia for the first-degree murder of Leonard Vivian (Leonard).[1] (Pen. Code, § 187, subd. (a).)[2] Patterson and Garcia were each sentenced to a prison term of 25 years to life.

## TRIAL EVIDENCE

In the days before April 28, 2011, Leonard[3] showed his friend Michelle Toner (Toner) a backpack full of cash and silver coins.[4] Toner did not know how Leonard had come by the cash.

On April 28, 2011, Leonard asked his mother, Mary, to take him to rent a storage unit. Leonard did not have his identification, so Mary rented a unit for him at Derrel's Mini Storage. Mary drove Leonard to the specific unit they had rented. Leonard exited the car and took a backpack with him to the storage unit. Leonard also put a safe into the

---

[1] The information also alleged several firearm enhancements, but those were apparently dismissed by the prosecution during trial.

[2] All further statutory references are to the Penal Code unless otherwise stated.

[3] Since Leonard and Mary share a last name, we will refer to them by their first names for the sake of clarity.

[4] Toner "might have" told a detective that she estimated the backpack contained $30,000.

storage unit. Mary could tell Leonard was "stressed over something," but she "didn't want to know what was going on" and stayed in the car.

Later that same day, Mary drove Leonard to a Quality Inn. Mary rented a room for Leonard since he did not have identification. She came out to tell Leonard the price of a room and saw him speaking with a male and a female in a red car. Leonard paid for the room with cash.

Leonard went to the room Mary had rented. At some point, he came out of the room and spoke to his friend, Toner, who was there with her then-boyfriend, Dustin Rutledge (Rutledge).[5] Toner and Leonard began to argue about cell phones. Leonard had bought two phones – one newer and the other older. Toner and Leonard argued over who would use which phone that day. One of the two phones was a blue Android cell phone. Rutledge and Toner left with the other phone.

Rutledge called Leonard and told him Toner was mad because she did not want the phone she had received. Toner and Rutledge went back to the Quality Inn to trade phones with Leonard. Rutledge went to Leonard's room and returned with the blue Android cell phone and money[6] from Leonard to get food.

Toner returned to the Quality Inn later that night with defendants Patterson and Garcia. Their intention was to "go get money" from Leonard. Toner sent a text message or called Leonard, who told them what room he was staying in. Garcia stayed in the car while Toner and Patterson went to Leonard's room. Surveillance footage from the Quality Inn depicts Toner and Patterson near Leonard's room around 1:11 a.m.

Leonard did not know Patterson, so Toner introduced them, and they smoked a cigarette. Leonard then gave Toner $100 so that she could buy drugs for him (Leonard).

_____

[5] Toner testified that she saw Leonard arguing with his mother in the parking lot near a pool. Toner testified that Leonard then "went to the room" and then "came back out" and spoke to her. This testimony appears to indicate that Leonard "came back out" to the parking lot.

[6] Toner testified she "could have" told a detective they had been given $100.

Toner and Patterson got back into Garcia's car and went to buy "crystal meth." Toner, Patterson, and Garcia then went to an apartment complex managed by Rutledge's grandmother. Toner did not bring the drugs back to Leonard and, in fact, did not return to Leonard's room for the rest of the night.

After Toner was "dropped … off" she "had no idea what had happened to the [blue Android] phone from that point on." However, Toner said she did not give the blue Android to either defendant.

Surveillance footage from the Quality Inn shows two men, later identified as Patterson and Garcia,[7] approaching Leonard's room at 1:41 a.m. The two men are then seen running away from the room at 1:48 a.m. Detective Villalvazo observed that the surveillance video depicts Garcia with "something wrapped on his arm."

Detective Villalvazo later watched the Quality Inn's surveillance footage "until about daylight. I'm going to say between 8, 9 in the morning." Villalvazo testified that the only people anywhere near room 147 on the surveillance footage he watched were: (1) the male and female around 1:10 a.m.[8] and (2) the two males approaching, then running away between 1:40.a.m and 1:48 a.m.[9]

Quality Inn housekeeping staff found Leonard dead in his motel room the next day.[10] Housekeeping informed the manager, who then went to the room, observed a

---

[7] Toner identified the two men running out of Leonard's room as Garcia and Patterson.

[8] Toner identified the female as herself and the male as Patterson.

[9] The prosecutor asked Detective Villalvazo: "Just going back, again, to the entirety of the footage that you viewed – not just what we saw here in court but the entirety of what you viewed at 147, aside from the female and the male who appeared to be approaching the walking [sic] away from [sic] and then approaching room 147 around 1:10 AM and then the two males approaching and then leaving between 1:40 and 1:48, did you see anyone else anywhere around room 147 in all the footage that you saw?" Detective Villalvazo responded, "No."

[10] There was no direct evidence introduced regarding the time of death or even the exact time of day housekeeping found Leonard's body. The manager testified that he called police after seeing the body, and former-Officer Coleman testified he was

person lying on the floor not moving, and called the police. Stephen Coleman, a police officer at the time, was dispatched to the Quality Inn at 1:19 p.m. When Coleman responded to the scene, he observed that the room was in "disarray" and appeared as though "somebody had gone through virtually all of the room searching or looking for something." Coleman initially thought Leonard had died of a drug overdose because there was a lighter in his hand and a methamphetamine pipe nearby. However, the coroner eventually moved Leonard's body revealing multiple gunshot wounds, including one to each side of the chest and one on the left arm.

Two small baggies containing methamphetamine were found in the room. The pipe located near Leonard's body had methamphetamine residue. No weapons were found in the room. A pair of jeans found in the room contained a card from Derrel's Mini Storage with a "space number" and a code on it.

*Detective Villalvazo's Interview with Toner*

On May 4, 2011,[11] Detective Villalvazo contacted Toner and interviewed her sometime thereafter. She had dyed her hair since April 28, 2011. She told Villalvazo that she had seen Leonard with an estimated $30,000 in a backpack sometime before he died. Villalvazo asked her whether Patterson and Garcia knew Leonard had the money. Toner replied that "everyone knew and was talking about it." At trial, Toner denied talking with Patterson and Garcia about robbing Leonard.

*Derrel's Mini Storage*

Law enforcement executed a search warrant at unit 2756 of a Derrel's Mini Storage and found only a small safe inside. Inside the safe was $10,700 in cash and 73 one-ounce silver coins.

---

dispatched at 1:19 p.m. However, it is unclear how much time elapsed between the manager's call and Coleman's dispatch because the manager testified that an ambulance came first and police arrived "later on."

[11] Detective Vilallvazo testified that he made contact with Toner on "May 4." It seems readily apparent that this occurred in 2011.

*Patterson's Arrest*

On May 1, 2011, Patterson was arrested after being stopped in a vehicle. Patterson was a rear passenger in the vehicle. The vehicle also had two occupants in the front of the vehicle, one of whom was a woman named Melanie Heimgartner (Heimgartner). The occupants of the vehicle, including Patterson, initially complied with officers' commands and put their hands up. Patterson was holding "what appeared to be a dark blue or dark gray cell phone in his right hand." Patterson then put his hands back down towards his lap and began to move around. One officer ordered Patterson to put his hands back up. Patterson paused, looked at the officer over his right shoulder for a few seconds, and then put his hands back up. This time, his hands were empty.

A police officer observed a dark blue or dark gray cell phone in the "magazine pouch" on the back side of the driver's seat.[12] Toner testified that the phone found in the vehicle looked "similar" to the one Leonard had the day before he died.

Patterson was arrested wearing the same clothing as one of the men running away from Leonard's room at 1:48 a.m. on April 29, 2011.

*Garcia*

On May 17, 2011, Detective Villalvazo was informed that Garcia wanted to turn himself in.

*Patterson's Jail Phone Calls*

Patterson's phone calls from jail were recorded and provided to a Detective Yee. Several were played for the jury.

On one phone call, Heimgartner told Patterson that "they got that phone" and that the "po-pos … got the credit cards too." She told Patterson to "[b]lame it on me[,] say it was that girl that was in the passenger's seat."

---

[12] An orange cell phone was retrieved on Patterson's person.

On another call with Heimgartner, Patterson said, "I'm going to say I was with you."

Patterson also had the following exchange with Heimgartner:

"B.P.: (UNINTELLIGIBLE) see the only thing that can really, really, really f[**]k me, is the video surveillance. Right?

"M.H.:          Yeah. 'Cause Dustin said it's pointed right at that room.

"B.P.:          Who said that, Dustin?

"M.H.:          Uh-huh. I bet you probably think you're cooler than me.

"B.P.:          I was wearing the same hat, same jacket that night."

On a different call, Patterson had the following exchange with Heimgartner:

"B.P.:          All they gotta do is pull – pull off the camera. Uh, the camera matches what I was wearing dude.

"M.H.:          I love you.

"B.P.:          You hear me, babe?

"M.H.:          What? I'm sorry what did you say babe?

"B.P.:          What's on the camera matches what I was wearing tonight.

"M.H.:          Shut up.

"B.P.:          It's a wrap.

"M.H.:          Be quiet already, baby. Okay, just be quiet."

Later on the same call, Patterson said, "I need an alibi."

Patterson told someone named Chris that he "need[ed] to find that phone," and that the "phone will get me f[**]king a lot of time." Later, referring to a phone, Patterson said "that shit is [going to] get someone a lot of time … like f[**]king life homey."

Patterson also asked Heimgartner on a call: "How the f[**]k do they know that was me?"

7.

On a call with someone referred to as "Youngster," Patterson said, "There was no robbery. There was nothing taken."

*Doralinda Alvarez*

A woman named Doralinda Alvarez testified at the preliminary hearing and her testimony was read into evidence at trial. Alvarez refused to identify defendant Garcia as her nephew. Alvarez said she did not recall talking to police officers and provided no relevant testimony.

*Felony-Murder Theory*

The only theory of murder presented to the jury was felony murder, with the alleged underlying felony being attempted robbery.

## DISCUSSION

I. THE TRIAL COURT DID NOT ERR IN DENYING PATTERSON'S MOTION TO SUPPRESS

Patterson moved pretrial to suppress evidence stemming from his arrest. Patterson argued that the police improperly obtained GPS and prospective cell phone data, without a warrant, and used the data to locate and arrest him.

### A. *Evidentiary Hearing*

An evidentiary hearing was held on Patterson's motion.

After viewing a photograph of Patterson, Detective Villalvazo concluded that he was one of the men depicted in the Quality Inn surveillance footage. Villalvazo began to do "background work on Mr. Patterson" and discovered he was "on CDC parole status."[13]

The "parole computer system" also provided a list of cellular phone numbers for Patterson. Using this information, Detective Villalvazo learned that Patterson's number

---

[13] Patterson's parole agent also testified that he was on active parole on April 28, 2011, and May 1, 2011. The parole agent also confirmed that Patterson had a search condition and seizure condition that applied to cell phones.

8.

was provided by T-Mobile. Villalvazo "obtained an order to attempt to acquire the location of" Patterson's cell phone. T-Mobile began sending the location of Patterson's cell phone to Villalvazo.

Sometime around May 1, 2011, Detective Villalvazo provided Officer Keith Dooms with a photograph of Patterson and requested that he attempt to locate and arrest Patterson for a parole violation. Dooms and other members of the street violence bureau tactical team set up surveillance operations at locations throughout the city. Villalvazo was continually receiving "pings from T-Mobile as to the location of the device,"[14] which he would periodically convey to the surveillance team.

At some point, Detective Cantu advised over the radio that unknown occupants were getting into a vehicle on West Spruce in Pinedale.

Officer Dooms observed the vehicle and saw Patterson in the left rear passenger seat. Dooms also asked for assistance from other patrol units. The vehicle pulled in to a Motel 6 parking lot. Patrol officers ordered the vehicle's three occupants to put their hands up. All three occupants initially complied, and Dooms observed a dark cell phone in Patterson's hand. As patrol officers began ordering occupants out of the car, Patterson moved his hands down towards his lap or the floorboard area. According to Dooms, Patterson's head "went down and stayed down like he was focusing toward his feet, making some sort of erratic movements with his hands." Dooms ordered Patterson to put his hands up, but he did not initially comply. After Patterson looked at Dooms "for a minute," he then brought his hands back up. When he brought his hands back up, there was nothing in them.

The cell phone for which T-Mobile was providing location data was found in the left rear of the vehicle. "At the time of the traffic stop Mr. Patterson was still wearing the exact clothing that was on video of the night of the homicide."

---

**14** This quotation is from a question posed to Detective Villalvazo to which he responded affirmatively.

9.

The trial court found defendant was subject to search of his property as a condition of his parole, and denied the motion.

### B. *Legal Principles*

Patterson contends the "use of cell phone tracking technology violates the Fourth Amendment … just as does GPS tracking." (See *United States v. Jones* (2012) 132 S.Ct. 945 (*Jones*).) He further contends that his parole status does not change the analysis. We disagree.

#### 1. Standard of Review

"On appeal from a denial of a motion to suppress evidence on Fourth Amendment grounds we review the historical facts as determined by the trial court under the familiar substantial evidence standard of review. Once the historical facts underlying the motion have been determined, we review those facts and apply the de novo standard of review in determining their consequences. Although we give deference to the trial court's factual determinations we independently decide the legal effect of such determinations. [Citation.]' [Citation.]" (*People v. Mateljian* (2005) 129 Cal.App.4th 367, 373.)

#### 2. Fourth Amendment and Parole Search Law

"A warrantless search is unreasonable under the Fourth Amendment unless it is conducted pursuant to one of the few narrowly drawn exceptions to the constitutional requirement of a warrant. [Citations.] California's parole search clause is one of those exceptions. (*Samson v. California* (2006) 547 U.S. 843, 846 []).'" (*People v. Schmitz* (2012) 55 Cal.4th 909, 916.)

"Under California statutory law, every inmate eligible for release on parole 'is subject to search or seizure by a ... parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause.' (Pen. Code, § 3067, subd. (b)(3).) Upon release, the parolee is notified that '[y]ou and your residence and any property under your control may be searched without a warrant at any time by any agent of the Department of Corrections [and Rehabilitation] or any law enforcement

10.

officer.' (Cal. Code Regs., tit. 15, § 2511, subd. (b)(4); [citation].)" (*People v. Schmitz, supra*, 55 Cal.4th at p. 916.)

C. *Analysis*

The "search" at issue here is Detective Villalvazo's receipt of information providing the location of Patterson's cell phone. There are several ways to view this "search" in legal terms, none of which help Patterson.

First, we could consider it a search of nontangible location data controlled by T-Mobile.[15] But that view does not aid Patterson. " 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' [Citations.] A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's … property has not had any of his Fourth Amendment rights infringed. [Citation.]" (*Rakas v. Illinois* (1978) 439 U.S. 128, 133–134.) Likewise, "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. [Citation.]" (*United States v. Davis* (11th Cir. 2015) 785 F.3d 498, 508, quoting *United States v. Miller* (1976) 425 U.S. 435, 443.) Thus, to the extent the "thing" searched in this case was data controlled by T-Mobile, it was not Patterson's to withhold even though the data concerned him. (Cf. *United States v. Davis, supra*, at p. 511.)[16]

---

[15] Under this conceptualization of the search, *Jones, supra*, 132 S.Ct. 945, is readily distinguishable. While *Jones*'s holding was predicated on the fact that the government had "physically occupied private property for the purpose of obtaining information" (*Id*. at p. 959), this case did not involve a physical intrusion on private property at all. (Cf. *United States v. Davis, supra*, 785 F.3d at p. 514.)

[16] The *Davis* court observed that "[t]he use of cell phones is ubiquitous now and some citizens may want to stop telephone companies from compiling cell tower location data or from producing it to the government." The *Davis* court acknowledged that there are "thoughtful arguments for changing the underlying and prevailing law" but concluded

11.

Second, the police conduct could be viewed as a search of the cell phone itself. But this also provides no help to Patterson because his property was subject to warrantless searches as a condition of his parole. (See Cal. Code Regs., tit. 15, § 2510 ["any property under your control may be searched without a warrant at any time by … any law enforcement officer"].)

Third, the police conduct could arguably be considered a search of Patterson's person since the information revealed his personal location. But even if we were to accept this premise, it would not help Patterson because his person was subject to warrantless search as a condition of parole. (See Cal. Code Regs., tit. 15, § 2510 ["You … may be searched without a warrant at any time by … any law enforcement officer"].)

Regardless of how the search in this case is conceptualized, there is no basis for overturning the trial court's denial of Patterson's motion to suppress.[17]

II.     THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE MURDER
        CONVICTIONS

    A.     *Substantial Evidence*

Patterson and Garcia argue there was insufficient evidence to support their murder convictions.

---

that such "proposals should be directed to Congress and the state legislatures rather than to the federal courts." (*United States v. Davis, supra*, 785 F.3d at p. 512.)

We agree there are several considerations that counsel against allowing law enforcement to obtain the location of a person's cell phone without a warrant. However, we agree with *Davis* that, absent a constitutional violation, those arguments must be made to the political branches.

We note that extended tracking of an individual's location over the course of weeks or months might pose constitutional problems. (Cf. *United States v. Maynard* (2010) 615 F.3d 544.) Such extended tracking is not an issue in this case, however.

[17] Accordingly, we need not address the issues of inevitable discovery or harmlessness.

1.  Standard of Review

" ' "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" ' [Citation.]" (*People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1063.)

2.  Surveillance Footage

Toner testified that Leonard was alive at 1:10 a.m. Detective Villalvazo testified he viewed surveillance footage until approximately 8:00 or 9:00 a.m. and saw no one else near room 147 after 1:10 a.m. other than Garcia and Patterson who were seen running from the room at 1:48 a.m. This evidence raises a strong inference that Patterson and Garcia killed Leonard in his room at, or shortly before, 1:48 a.m.

However, Detective Villalvazo only viewed surveillance footage until approximately 8:00 or 9:00 a.m., and it is unclear when Leonard's body was discovered. The responding officer was not dispatched until 1:19 p.m. the next day, which suggests Leonard's body was found hours after the end of the footage watched by Villalvazo.

It is unclear why Detective Villalvazo did not simply view the surveillance footage up until the time Leonard's body was discovered. As Villalvazo's testimony currently stands, there is a "gap" from at least 9:00 a.m. until whenever Leonard's body was discovered. Nonetheless, the inference that Garcia and Patterson killed Leonard in the middle of the night and then ran from the scene[18] is far stronger than any speculative possibilities as to what additional daylight surveillance footage would have shown.[19]

---

[18] The jury was instructed that evidence of flight "may show that [the defendants were] aware of [their] guilt" but does not, by itself, prove guilt. (See § 1127c.)

[19] Detective Villalvazo testified that, at the time, there were people staying in the motel less than 50 feet from Leonard's room.

### 3. Evidence Concerning the Blue Android Phone

Additionally, the prosecution's case was bolstered by the evidence concerning the blue Android phone. Immediately before his arrest, Patterson was seen holding "what appeared to be a dark blue or dark gray cell phone in his right hand," and a blue Android phone was ultimately found in the vehicle near his seat.

Importantly, there was also evidence raising an inference that the blue Android found near Patterson's seat was Leonard's. First, Toner testified that the phone recovered in the vehicle appeared similar to the one Leonard had loaned her the day before his death. Second, the phone recovered in the vehicle had been "basically wiped clear." This evidence raises an inference that someone had "wiped" the phone because it contained or constituted incriminating evidence. And Officer Dooms's observation of Patterson's conduct immediately before arrest (i.e., holding what appeared to be a dark cell phone and disobeying orders from officers to bring his hands down with the object and then move around) raises the inference that Patterson wiped the phone, or was at least trying to do so.[20]

Finally, Toner told Detective Villalvazo that she had not given Leonard's blue Android phone to Garcia or Patterson.

Together, these pieces of evidence raise the inference that Patterson had taken the phone from Leonard. This evidence strengthens the inference raised by the surveillance footage showing Patterson and Garcia running from Leonard's room in the middle of the night.

We conclude the convictions are supported by substantial evidence.

### DISPOSITION

The judgments of conviction are affirmed.

---

[20] This inference is supported by Patterson's jail calls wherein he made comments like, "You need to find that phone, Chris, it's no joke. Chris, you have – that phone will get me f[**]king a lot of time." However, the jury was instructed not to consider Patterson's oral, pretrial statements against Garcia.

                                                _____

POOCHIGIAN, J.

WE CONCUR:


_____

HILL, P.J.


_____

FRANSON, J.